[Crim. No. 20081. Sept. 26, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD JAY DREW, Defendant and Appellant.

**COUNSEL**

Appellate Defenders, Inc., under appointment by the Supreme Court, and Harold F. Tyvoll for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Alan S. Meth, Harley D. Mayfield and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**TOBRINER, J.**—For over a century California has followed the M'Naghten[1] test[2] to define the defenses of insanity and idiocy. The deficiencies of that test have long been apparent, and judicial attempts to reinterpret or evade the limitations of M'Naghten have proven inadequate. We shall explain why we have concluded that we should discard the M'Naghten language, and update the California test of mental incapacity as a criminal defense by adopting the test proposed by the American Law Institute[3] and followed by the federal judiciary and the courts of 15 states.

---

[1] Daniel M'Naghten was inconsistent in the spelling of his name, and courts and commentators ever since have shared in that inconsistency. (See Frankfurter, Of Law and Life and Other Things (1965) p. 3.) We follow the spelling in the Clark and Finnelly report of the M'Naghten case.

[2] "[T]o establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." (*M'Naghten's Case* (1843) 10 Clark & Fin. 200, 210 [8 Eng. Rep. 718, 722].)

[3] "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the

Understandably, in view of our past adherence to M'Naghten, neither the psychiatrists who examined defendant nor· the jury evaluated defendant's capacity in terms of the ALI test. Since the evidentiary record indicates that defendant, a former mental patient with a history of irrational assaultive behavior, lacked the capacity to conform his conduct to legal requirements, we conclude that the court's failure to instruct the jury under the ALI test was prejudicial, and therefore reverse the conviction.

Defendant Drew also contends that Evidence Code section 522, which requires a defendant to prove insanity by a preponderance of the evidence, is unconstitutional. Controlling precedent in the United States Supreme Court (see *Patterson* v. *New York* (1977) 432 U.S. 197 [53 L.Ed.2d 281, 97 S.Ct. 2319]), and in this court (see *People* v. *Miller* (1972) 7 Cal.3d 562 [102 Cal.Rptr. 841, 498 P.2d 1089]) mandates the rejection of this contention.

Finally, Drew argues that the record is insufficient to sustain the jury finding of sanity. We conclude, however, that a jury instructed under the M'Naghten rule could reasonably find that defendant failed to prove by a preponderance of the evidence that he was unaware of the wrongfulness of his conduct. Thus Drew is not entitled to an order directing the trial court to find him insane, but only to a new trial on the issue of sanity in which the jury is instructed under the ALI test.

1. *Statement of Facts.*

Defendant Drew, a 22-year-old man, was drinking in a bar in Brawley during the early morning of October 26, 1975. He left $5 on the bar to pay for drinks and went to the men's room. When he returned, the money was missing. Drew accused one Truman Sylling, a customer at the bar, of taking the money. A heated argument ensued, and the bartender phoned for police assistance.

Officers Guerrero and Bonsell arrived at the bar. When Guerrero attempted to question Sylling, Drew interfered to continue the argument. Bonsell then asked Drew to step outside. Drew refused. Bonsell took Drew by the hand, and he and Officer Schulke, who had just arrived at

criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." (Model Pen. Code (Proposed Official Draft) (1962) § 4.01, subd. (1).)

the bar, attempted to escort Drew outside. Drew broke away from the officers and struck Bonsell in the face. Bonsell struck his head against the edge of the bar and fell to the floor. Drew fell on top of him and attempted to bite him, but was restrained by Guerrero and Schulke. Drew continued to resist violently until he was finally placed in a cell at the police station.

Charged with battery on a peace officer (Pen. Code, § 243), obstructing an officer (Pen. Code, § 148), and disturbing the peace (Pen. Code, § 415), Drew pled not guilty and not guilty by reason of insanity. At the guilt trial, Drew testified on his own behalf; he denied striking Bonsell and maintained that the officer's injuries were accidental. Bonsell's testimony, however, was corroborated by Guerrero and Sylling. The jury found Drew guilty as charged.

Two court-appointed psychiatrists testified at the sanity trial. Dr. Otto Gericke, former Medical Director at Patton State Hospital, testified that Drew was committed to that hospital for nine months in 1972 after Drew was found incompetent to stand trial on an unspecified charge. He examined him on that occasion; again on February 1, 1976, to determine Drew's competency to stand trial on the instant charge; and a third time on June 6, 1976, on the question of Drew's sanity.

Dr. Gericke described Drew's condition as one of latent schizophrenia, characterized by repeated incidents of assaultive behavior and by conversing with inanimate objects and nonexistent persons; this condition could be controlled by medication but if left untreated would deteriorate to paranoid schizophrenia.

Relying upon his examinations and Drew's medical history at Patton State Hospital, Dr. Gericke concluded that Drew was unable to appreciate the difference between right and wrong at the time he attacked Officer Bonsell.

The second witness, Dr. Ethel Chapman, was a staff psychiatrist at Patton State Hospital. She also examined Drew under court appointment in February and June of 1976, and was acquainted with him from his stay at the hospital in 1972. She concurred with Dr. Gericke's diagnosis of his condition, adding the observation that his symptoms would be aggravated by the ingestion of alcohol, and joined in Dr. Gericke's conclusion that Drew did not understand that his assault upon Officer Bonsell was wrong.

The prosecution presented no evidence at the sanity trial. Nevertheless the jury, instructed that the defendant has the burden of proving insanity under the M'Naghten test, found him sane. The court thereupon sentenced Drew to prison on the battery conviction. He appeals from the judgment of conviction.

2. *This court should adopt the American Law Institute test, as stated in section 4.01, subpart (1) of the Model Penal Code, to define the defense of insanity.*

The trial court instructed the jury that "Legal insanity . . . means a diseased or deranged condition of the mind which makes a person incapable of knowing or understanding the nature and quality of his act, or makes a person incapable of knowing or understanding that his act was wrong."[4] We explain that this instruction, based on the M'Naghten test, was erroneous, and on the record before us constitutes prejudicial error requiring reversal of the judgment.

 The purpose of a legal test for insanity is to identify those persons who, owing to mental incapacity, should not be held criminally responsible for their conduct. The criminal law rests on a postulate of free will—that all persons of sound mind are presumed capable of conforming their behavior to legal requirements[5] and that when any such person freely chooses to violate the law, he may justly be held responsible. (See Goldstein, The Insanity Defense (1967) pp. 9-10.) From the earliest days of the common law, however, the courts have recognized that a few persons lack the mental capacity to conform to the strictures of the law. Thus in 1582 William Lambart of Lincoln's Inn wrote that "If . . . a mad man or a natural fool, or a lunatic in the time of his lunacy, or a child who apparently had no knowledge of good or evil, do kill a man, this is no felonious act . . . for they cannot be said to have any understanding will." (Lambart, Eirenarcha (1582) Cat. 21.218. (Spelling modernized).)

[4]Neither Drew's briefs in the Court of Appeal nor his petition for hearing attacked the court's instruction. The question whether we should continue to adhere to the M'Naghten rule, however, had been well briefed and argued before this court in an earlier case, *In re Ramon M.* (Crim. 19933). Finding that the evidentiary record in the present case presented a more suitable vehicle for resolution of that issue, we granted a hearing and requested counsel by letter to submit briefs and present argument on the M'Naghten issue. (See *In re Smith* (1970) 3 Cal.3d 192, 203, fn. 3 [90 Cal.Rptr. 1, 474 P.2d 969].)

[5]See, e.g., *Morissette v. United States* (1952) 342 U.S. 246, 250 [96 L.Ed. 288, 293, 72 S.Ct. 240]; *People v. Wolff* (1964) 61 Cal.2d 795, 814 [40 Cal.Rptr. 271, 394 P.2d 959]; *People v. Nash* (1959) 52 Cal.2d 36, 50-54 [338 P.2d 416]; *People v. Gorshen* (1959) 51 Cal.2d 716, 726 [336 P.2d 492].

The principle that mental incapacity constitutes a defense to crime is today accepted in all American jurisdictions. (See Weihofen, Mental Disorder as a Criminal Defense (1954) p. 51.)

The California Penal Code codifies the defense of mental incapacity. Section 20 states that "[i]n every crime . . . there must exist a union . . . of act and intent." Section 21 provides as to persons of sound mind "[t]he intent . . . is manifested by the circumstances connected with the offense" and that "All persons are of sound mind who are neither idiots nor lunatics, nor affected with insanity." Finally section 26 specifies that "All persons are capable of committing crimes except those belonging to the following classes" and includes among those classes "Idiots" and "Lunatics and insane persons."[6]

■ Although the Legislature has thus provided that "insanity" is a defense to a criminal charge, it has never attempted to define that term. The task of describing the circumstances under which mental incapacity will relieve a defendant of criminal responsibility has become the duty of the judiciary.

Since *People* v. *Coffman* (1864) 24 Cal. 230, 235, the California courts have followed the M'Naghten rule to define the defense of insanity. The curious origin of the M'Naghten rule has been frequently recounted. (See, e.g., *United States* v. *Freeman* (2d Cir. 1966) 357 F.2d 606, 616-617; Weihofen, Mental Disorder as a Criminal Defense, *supra,* pp. 59-63.) In 1843 Daniel M'Naghten, afflicted with paranoia, attempted to assassinate the Prime Minister of England, and succeeded in killing the Prime

---

[6]Section 26 reads as follows:

"All persons are capable of committing crimes except those belonging to the following classes:

"One—Children under the age of 14, in the absence of clear proof that at the time of committing the act charged against them, they knew its wrongfulness.

"Two—Idiots.

"Three—Lunatics and insane persons.

"Four—Persons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent.

"Five—Persons who committed the act charged without being conscious thereof.

"Six—Persons who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention or culpable negligence.

"Seven—Persons (unless the crime be punishable with death) who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused."

The term "lunatics" in subdivision three probably referred to persons who had lucid intervals; "insane persons" to those who lacked lucid intervals. The cases do not distinguish between the two terms.

Minister's secretary. M'Naghten's acquittal on grounds of insanity so disturbed Queen Victoria that she summoned the House of Lords to obtain the opinion of the judges on the law of insanity. The 15 judges of the common law courts were called in an extraordinary session, "under a not subtle atmosphere of pressure" (*United States* v. *Freeman, supra,* 357 F.2d 606, 617), to answer five hypothetical questions on the law of criminal responsibility.

In response to two of the questions propounded the judges stated that "to establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." (*M'Naghten's Case, supra,* 10 Clark & Fin. 200, 210 [8 Eng. Rep. 718, 722].) Although an advisory opinion, and thus most questionable authority (see 2 Stephen, History of the Criminal Law of England (1883) p. 153), this language became the basis for the test of insanity in all American states except New Hampshire. (Weihofen, Mental Disorder as a Criminal Defense, *supra,* pp. 68-69.)

Despite its widespread acceptance, the deficiencies of M'Naghten have long been apparent. Principal among these is the test's exclusive focus upon the cognitive capacity of the defendant, an outgrowth of the then current psychological theory under which the mind was divided into separate independent compartments, one of which could be diseased without affecting the others. (See *United States* v. *Currens* (3d Cir. 1961) 290 F.2d 751, 766.) As explained by Judge Ely of the Ninth Circuit: "The M'Naghten rules fruitlessly attempt to relieve from punishment only those mentally diseased persons who have no cognitive capacity. . . . This formulation does not comport with modern medical knowledge that an individual is a mentally complex being with varying degrees of awareness. It also fails to attack the problem presented in a case wherein an accused may have understood his actions but was incapable of controlling his behavior. Such a person has been allowed to remain a danger to himself and to society whenever, under *M'Naghten,* he is imprisoned without being afforded such treatment as may produce rehabilitation and is later, potentially recidivistic, released." (*Wade* v. *United States* (9th Cir. 1970) 426 F.2d 64, 66-67.) (Fns. omitted.)[7]

---

[7]Numerous other cases and writers have critized M'Naghten's failure to include a volitional element in its test of insanity. (See, e.g., *United States* v. *Freeman, supra,* 357 F.2d 606, 618; *Dusky* v. *United States* (8th Cir. 1961) 295 F.2d 743, 759; *Durham* v. *United*

M'Naghten's exclusive emphasis on cognition would be of little consequence if all serious mental illness impaired the capacity of the affected person to know the nature and wrongfulness of his action. Indeed, the early decision of *People* v. *Hoin* (1882) 62 Cal. 120, 123, in rejecting the defense of "irresistible impulse," rested on this gratuitous but doubtful assumption. Current psychiatric opinion, however, holds that mental illness often leaves the individual's intellectual understanding relatively unimpaired, but so affects his emotions or reason that he is unable to prevent himself from committing the act. (See *United States* v. *Smith* (6th Cir. 1968) 404 F.2d 720, 725.) "[I]nsanity does not only, or primarily, affect the cognitive or intellectual faculties, but affects the whole personality of the patient, including both the will and the emotions. An insane person may therefore often know the nature and quality of his act and that it is wrong and forbidden by law, and yet commit it as a result of the mental disease." (Rep. Royal Com. on Capital Punishment, 1949-1953, p. 80.)

The annals of this court are filled with illustrations of the above statement: the deluded defendant in *People* v. *Gorshen, supra,* 51 Cal.2d 716, who believed he would be possessed by devilish visions unless he killed his foreman; the schizophrenic boy in *People* v. *Wolff, supra,* 61 Cal.2d 795, who knew that killing his mother was murder but was unable emotionally to control his conduct despite that knowledge; the defendant in *People* v. *Robles* (1970) 2 Cal.3d 205 [85 Cal.Rptr. 166, 466 P.2d 710], suffering from organic brain damage, who mutilated himself and killed others in sudden rages. To ask whether such a person knows or understands that his act is "wrong" is to ask a question irrelevant to the nature of his mental illness or to the degree of his criminal responsibility.

Secondly, "M'Naghten's single track emphasis on the cognitive aspect of the personality recognizes no degrees of incapacity. Either the defendant knows right from wrong or he does not. . . . But such a test is grossly unrealistic. . . . As the commentary to the American Law Institute's Model Penal Code observes, 'The law must recognize that when there is no black and white it must content itself with different shades of gray.' " (*United States* v. *Freeman, supra,* 357 F.2d 606, 618-619, quoting ALI, Model Pen. Code (Tent. Drafts, Nos. 1, 2, 3, and 4, p. 158.)

In short, M'Naghten purports to channel psychiatric testimony into the narrow issue of cognitive capacity, an issue often unrelated to the

*States* (D.C. Cir. (1954) 214 F.2d 862, 870-871; *State* v. *White* (1969) 93 Idaho 153 [456 P.2d 797, 801]; Guttmacher & Weihofen, Psychiatry and the Law (1952) p. 409.)

defendant's illness or crime. The psychiatrist called as a witness faces a dilemma: either he can restrict his testimony to the confines of M'Naghten, depriving the trier of fact of a full presentation of the defendant's mental state (see *United States* v. *Freeman, supra,* 357 F.2d 606, 620; *Durham* v. *United States, supra,* 214 F.2d 862, 874), or he can testify that the defendant cannot tell "right" from "wrong" when that is not really his opinion because by so testifying he acquires the opportunity to put before the trier of fact the reality of defendant's mental condition. (See Brakel & Rock, The Mentally Disabled and the Law (2d ed. 1971) p. 387; Diamond, *Criminal Responsibility of the Mentally Ill* (1961) 14 Stan.L. Rev. 59, 60-61.) As Justice Frankfurter stated before the Royal Commission on Capital Punishment, "I think to have rules which cannot rationally be justified except by a process of interpretation which distorts and often practically nullifies them . . . is not a desirable system. . . . [T]he M'Naghten Rules are in large measure shams. That is a strong word, but I think the M'Naghten Rules are very difficult for conscientious people and not difficult enough for people who say 'We'll just juggle them.' " (Royal Com. on Capital Punishment, *op. cit. supra,* p. 102.)

Even if the psychiatrist is able to place before the trier of fact a complete picture of the defendant's mental incapacity, that testimony reaches the trier of fact weakened by cross-examination designed to show that defendant knew right from wrong (see, for example, the cross-examination described in *People* v. *Wolff, supra,* 61 Cal.2d 795, 812-814) and limited by the M'Naghten instruction. As a result, conscientious juries have often returned verdicts of sanity despite plain evidence of serious mental illness and unanimous expert testimony that the defendant was insane. (See *People* v. *Wolff, supra,* 61 Cal.2d 795, 812 and cases there cited.)

Conscious of the inadequacies of the M'Naghten test, California decisions have modified that test in two significant respects. First, in *People* v. *Wolff, supra,* 61 Cal.2d 795, we held that the mere capacity to verbalize socially acceptable answers to questions did not prove sanity; the defendant must not only know but also "appreciate" or "understand" the nature and wrongfulness of his act. (Pp. 800-801.) Second, in a series of decisions dating from *People* v. *Wells* (1949) 33 Cal.2d 330 [202 P.2d 53] and *People* v. *Gorshen, supra,* 51 Cal.2d 716, we developed the concept of diminished capacity, under which a defendant can introduce evidence of mental incapacity to negate specific intent, malice, or other subjective elements of the charged crime. Recently in *People* v. *Cantrell* (1973) 8 Cal.3d 672 [105 Cal.Rptr. 792, 504 P.2d 1256], we expressly held that

"irresistible impulse"—a concept evolved to supply the volitional element lacking in the M'Naghten test—can be utilized to prove diminished capacity. (Pp. 685-686.)

But these innovative modifications to the M'Naghten rule fail to cure its basic defects. *Wolff* ameliorates only one of the rigid categories of M'Naghten; as Professor Sherry explains: "It still . . . falls short of acknowledging the teaching of psychiatry that mental aberration may not only impair knowledge of wrongfulness but may very well destroy an individual's capacity to control or to restrain himself." (Sherry, *Penal Code Revision Project—Progress Report* (1968) 43 State Bar J. 900, 916.) The doctrine of diminished capacity, once hailed as a possible replacement for the defense of insanity (see Diamond, *Criminal Responsibility of the Mentally Ill* (1961) 14 Stan.L.Rev. 59), can now be seen to create its own problems.

The availability of a defense of diminished capacity turns largely on the nature of the crime charged. If the defendant is charged with a general intent crime, he cannot raise a defense of diminished capacity regardless of his impaired mental state. (*People* v. *Noah* (1971) 5 Cal.3d 469, 477 [96 Cal.Rptr. 441, 487 P.2d 1409]; *People* v. *Nance* (1972) 25 Cal.App.3d 925, 929 [102 Cal.Rptr. 266].) If charged with a specific intent crime, he may be able to reduce the offense to a lesser included general intent crime. If evidence of diminished capacity is used to negate criminal intent in a crime which contains no lesser offense, however, the defendant may secure his outright acquittal and release. (See Goldstein, The Insanity Defense, *supra*, pp. 201-202.) The effectiveness of the defense, and the disposition of the defendant, thus turn less on the nature and` seriousness of the defendant's mental disability than on the technical structure of the criminal law.

A defendant whose criminal activity arises from mental illness or defect usually requires confinement and special treatment. Penal Code sections 1026 and 1026a provide such confinement and treatment for persons acquitted on grounds . of insanity. A successful diminished capacity defense, on the other hand, results either in the release of the defendant or his confinement as an ordinary criminal for a lesser term. Because the diminished capacity defense thus fails to identify the mentally disturbed defendant, it may result in the defendant's not receiving the care appropriate to his condition. Such a defendant, who may still suffer from his mental· disturbance, may serve his term, be released and thus permitted to become a danger to the public. (See

Goldstein, The Insanity Defense, *supra,* p. 202; Brakel & Rock, The Mentally Disabled and the Law, *supra,* p. 395.)

In our opinion the continuing inadequacy of M'Naghten as a test of criminal responsibility cannot be cured by further attempts to interpret language dating from a different era of psychological thought, nor by the creation of additional concepts designed to evade the limitations of M'Naghten. It is time to recast M'Naghten in modern language, taking account of advances in psychological knowledge and changes in legal thought.

The definition of mental incapacity appearing in section 4.01 of the American Law Institute's Model Penal Code represents the distillation of nine years of research, exploration, and debate by the leading legal and medical minds of the country. (*United States* v. *Freeman, supra,* 357 F.2d 606, 622.) It specifies that "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law."[8]

Adhering to the fundamental concepts of free will and criminal responsibility, the American Law Institute test restates M'Naghten in language consonant with current legal and psychological thought. (Goldstein, The Insanity Defense, *supra,* p. 87.) It has won widespread acceptance, having been adopted by every federal circuit except for the first circuit[9] and by 15 states.[10]

[8]The American Law Institute takes no position as to whether the term "criminality" or the term "wrongfulness" best expresses the test of criminal responsibility; we prefer the term "criminality."

Subdivision 2 of the American Law Institute test provides that "the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct." The language, designed to deny an insanity defense to psychopaths and sociopaths, is not relevant to the present case. The question whether to adopt subdivision 2 of the ALI test is one which we defer to a later occasion.

[9]Federal Circuits (2d Cir.: *United States* v. *Freeman, supra,* 357 F.2d 606. 3d Cir.: *United States* v. *Currens, supra,* 290 F.2d 751. 4th Cir.: *United States* v. *Chandler* (1968) 393 F.2d 920. 5th Cir.: *Blake* v. *United States* (1969) 407 F.2d 908. 6th Cir.: *United States* v. *Smith, supra,* 404 F.2d 720. 7th Cir.: *United States* v. *Shapiro* (1967) 383 F.2d 680. 8th Cir.: *Pope* v. *United States* (1967) 372 F.2d 710. 9th Cir.: *Wade* v. *United States, supra,* 426 F.2d 64. 10th Cir.: *Wion* v. *United States* (1963) 325 F.2d 420. D.C. Cir.: *United States* v. *Brawner* (1972) 471 F.2d 969.)

[10]States (Alaska: *Schade* v. *State* (1973) 512 P.2d 907. Conn.: Conn. Gen. Stats., § 53a-13. Idaho: *State* v. *White, supra,* 456 P.2d 797. Ill.: Ill. Rev. Stats., ch. 38, § 6-2. Ind.: *Hill* v. *State* (1969) 252 Ind. 601 [251 N.E.2d 429]. Ky.: *Terry* v. *Commonwealth*

"In the opinion of most thoughtful observers this proposed test [the ALI test] is a significant improvement over M'Naughton." (*People* v. *Kelly* (1973) 10 Cal.3d 565, 581-582 [111 Cal.Rptr. 171, 516 P.2d 875] (Mosk, J. conc.).) The advantages may be briefly summarized. First, the ALI test adds a volitional element, the ability to conform to legal requirements, which is missing from the M'Naghten test. Second, it avoids the all-or-nothing language of M'Naghten and permits a verdict based on lack of substantial capacity. (See *Blake* v. *United States, supra,* 407 F.2d 908, 914; *United States* v. *Shapiro, supra,* 383 F.2d 680, 685.) Third, the ALI test is broad enough to permit a psychiatrist to set before the trier of fact a full picture of the defendant's mental impairments and flexible enough to adapt to future changes in psychiatric theory and diagnosis. Fourth, by referring to the defendant's capacity to "appreciate" the wrongfulness of his conduct the test confirms our holding in *People* v. *Wolff, supra,* 61 Cal.2d 795, that mere verbal knowledge of right and wrong does not prove sanity. Finally, by establishing a broad test of nonresponsibility, including elements of volition as well as cognition, the test provides the foundation on which we can order and rationalize the convoluted and occasionally inconsistent law of diminished capacity. (See discussion in Comment, *Keeping Wolff From the Door: California's Diminished Capacity Concept* (1972) 60 Cal.L.Rev. 1641, 1649; Comment, *Diminished Capacity: Its Potential Effect in California* (1970) 3 Loyola L.A. L.Rev. 153, 154.)

In light of the manifest superiority of the ALI test, the only barrier to the adoption of that test we perceive lies in the repeated judicial declarations that any change in the M'Naghten rule requires legislative action. (See *People* v. *Wolff, supra,* 61 Cal.2d 795, 803; *People* v. *Darling* (1962) 58 Cal.2d 15, 23 [22 Cal.Rptr. 484, 372 P.2d 316]; *People* v. *Rittger* (1960) 54 Cal.2d 720, 732 [7 Cal.Rptr. 901, 355 P.2d 645]; *People* v. *Nash, supra,* 52 Cal.2d 36, 48-49; *People* v. *Berry* (1955) 44 Cal.2d 426, 433 [282 P.2d 861]; *People* v. *Daugherty* (1953) 40 Cal.2d 876, 894 [256 P.2d 911].) This pronouncement rests on two bases: the lengthy history of the M'Naghten rule in California (see *People* v. *Daugherty, supra*) and the failure of the 1927 Legislature, when it revised the procedures for pleading and trying the defense of insanity, to overturn the M'Naghten test (see *People* v. *Nash, supra*).

(1963) 371 S.W.2d 862. Md.: Md. Code, art. 59, § 25. Mass.: *Commonwealth* v. *McHoul* (1967) 352 Mass. 544 [226 N.E.2d 556]. Mo.: Mo. Rev. Stats., § 552.030(3)(1). Mont.: Mont. Rev. Codes, § 95-501. Ohio: *State* v. *Statton* (1969) 18 Ohio St.2d 13 [247 N.E.2d 293]. Ore.: Ore. Rev. Stats. § 161.295(1). Tex.: Tex. Pen. Code, § 8.01. Vt.: Vt. Stats. Ann., tit. 13, § 4801. Wis.: *State* v. *Shoffner* (1966) 31 Wis.2d 412 [143 N.W.2d 458].)

The concept that an extended line of judicial decisions, accompanied by legislative inaction, can freeze the evolution of judicial principles, divesting the courts of authority to overturn their prior decisions, is not in good repute. In *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], when we adopted a rule of comparative negligence, we rejected the argument that any change in the law of contributory negligence was a matter for the Legislature, and overturned more than a century of precedent. In *Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382 [115 Cal.Rptr. 765, 525 P.2d 669], we expressly repudiated the assertion that recognition of a spousal action for loss of consortium required legislative action (see pp. 393-395) and, overruling prior decisions, endorsed that cause of action. In fact the decision of *Cole* v. *Rush* (1955) 45 Cal.2d 345 [289 P.2d 450, 54 A.L.R.2d 1137], on which *People* v. *Nash, supra,* 52 Cal.2d 36, 43 relied for its theory that legislative failure to overturn M'Naghten immunized that doctrine from judicial revision, was itself overruled in *Vesely* v. *Sager* (1971) 5 Cal.3d 153, 167 [95 Cal.Rptr. 623, 486 P.2d 151].

█ The principle underlying the cited cases is that the judiciary has the responsibility for legal doctrine which it has created.[11] (See *Rodriguez* v. *Bethlehem Steel Corp., supra,* 12 Cal.3d 382, 393; *People* v. *Pierce* (1964) 61 Cal.2d 879, 882 [40 Cal.Rptr. 845, 395 P.2d 893].) The power of the court to reshape judicial doctrine does not authorize us to overturn constitutionally valid statutes. But as Justice Mosk explained in his concurring opinion in *People* v. *Kelly, supra,* 10 Cal.3d 565, 580, the M'Naghten rule is not an integral part of the statutory structure of California criminal law. The Legislature has never enacted the M'Naghten rule as a test of insanity, and its provisions relating to criminal responsibility do not incorporate the M'Naghten formula. (See Pen. Code, §§ 26, 1016, 1367.) Thus replacement of the M'Naghten rule with the ALI test will not contradict or nullify any legislative enactment.

The concept expressed by some California courts, that any change must emanate from the Legislature, ignores the fact that the courts have already departed substantially from the M'Naghten formula. As we explained earlier, we rejected in *People* v. *Wolff, supra,* 61 Cal.2d 795, the

---

[11] When the law governing a subject has been shaped and guided by judicial decision, legislative inaction does not necessarily constitute a tacit endorsement of the precise stage in the evolution of the law extant at the time when the Legislature did nothing; it may signify that the Legislature is willing to entrust the further evolution of legal doctrine to judicial development. (See *Rodriguez* v. *Bethlehem Steel Corp., supra,* 12 Cal.3d 382, 393-398, and cases there cited; cf. *Marvin* v. *Marvin* (1976) 18 Cal.3d 660, 681 [134 Cal.Rptr. 815, 557 P.2d 106].)

portion of M'Naghten holding that a defendant who "knows" his act is wrong is sane, and held that he must "understand" or "appreciate" the wrongfulness of his act. We also created the doctrine of diminished capacity specifically to "ameliorate the law governing criminal responsibility prescribed by the M'Naghten rule" (*People* v. *Henderson* (1963) 60 Cal.2d 482, 490 [35 Cal.Rptr. 77, 386 P.2d 677]), and included in that doctrine concepts of irresistible impulse which the M'Naghten test rejects. Thus adoption of the ALI rule does not represent a radical break from precedent, but simply an additional step in the constant revision and updating of the test of criminal responsibility to correspond to current legal and psychological thought.

Five years ago Justice Mosk, in his concurring opinion in *People* v. *Kelly, supra,* 10 Cal.3d 565, 578, called upon this court to depart from the M'Naghten formulation and adopt the test proposed by the American Law Institute. ■ For the foregoing reasons, derived in large part from the analysis in Justice Mosk's concurrence, we now conclude that the California courts should employ the ALI test to define the defense of insanity.[12] This decision will apply retroactively only to those cases not yet final in which the defendant has pled not guilty by reason of insanity and to cases that have not yet come to trial as of the date of the finality of this opinion.

3. ■ *The defendant retains the burden of proof on the issue of insanity.*

Evidence Code section 522 provides explicitly that "The party claiming that any person, including himself, is or was insane has the burden of proof on that issue." The trial judge in the present case accordingly charged the jury that "the defendant has the burden of proving his legal insanity by a preponderance of the evidence."

Drew contends that the court's instruction denied him due process of law under the Fourteenth Amendment. He relies on *Mullaney* v. *Wilbur* (1975) 421 U.S. 684 [44 L.Ed.2d 508, 95 S.Ct. 1881], in which the United States Supreme Court struck down a Maine statute which required a homicide defendant to prove that he acted in the heat of passion to reduce the offense to manslaughter; the court's language suggested broadly that the state must prove beyond a reasonable doubt every fact

[12]Little purpose would be served by listing and expressly disapproving the numerous decisions which, between 1868 and the present, have stated the M'Naghten rule as the test of criminal responsibility; it should be sufficient to observe that language in any prior decision contrary to the views expressed herein is no longer authoritative.

critical to the guilt of the offender. More recent decisions of the Supreme Court have confirmed, however, that notwithstanding the broad dictum of *Mullaney,* "it remained constitutional to burden the defendant with proving his insanity." (*Patterson* v. *New York, supra,* 432 U.S. 197, 205 [53 L.Ed.2d 281, 289, 97 S.Ct. 2319, 2324]; see *Rivera* v. *State* (Del. 1976) 351 A.2d 561, app. dism. *sub nom. Rivera* v. *Delaware* (1976) 429 U.S. 877 [50 L.Ed.2d 160, 97 S.Ct. 226].)

Drew further contends that requiring him to bear the burden of proving insanity violates the due process clause of the California Constitution. (Cal. Const., art. I, § 7.) California courts, however, have consistently upheld the constitutionality of our rule placing the burden of proof on the defendant (see, e.g., *People* v. *Hickman* (1928) 204 Cal. 470, 477-478 [268 P. 909, 270 P. 1117]). Recently in *People* v. *Miller, supra,* 7 Cal.3d 562, 574, we unanimously rejected a defendant's contention that the rule conflicted with due process requirements. The validity of this settled line of authority was called into question only because of the broad language of the United States Supreme Court opinion in *Mullaney* v. *Wilbur, supra,* 421 U.S. 684; following that court's narrow interpretation of *Mullaney* in *Patterson* v. *New York, supra,* and its confirmation that a state may constitutionally require a defendant to prove insanity, doubts respecting the constitutionality of the California rule have been laid to rest.[13]

4. ■ *The record supports the jury's finding that defendant was sane under the M'Naghten test of insanity.*

Defendant Drew argues that even under the M'Naghten test the jury's finding of sanity is not supported by substantial evidence. If Drew should prevail in this contention, he would be entitled to an order directing the trial court to find him insane, thus avoiding a retrial of the case under the ALI test.[14] Thus although we have today rejected the M'Naghten rule, we must nevertheless determine whether the jury's verdict based on that rule

[13]Defendant points out that the federal courts (see *Davis* v. *U.S.* (1895) 160 U.S. 469 [40 L.Ed. 499, 16 S.Ct. 353]) and about half of the states (see Note (1976) 64 Geo. L.J. 871, 890, fn. 114; Annot. (1968) 17 A.L.R.3d 146) require the prosecution to prove sanity beyond a reasonable doubt. We are not, however, concerned with the wisdom of placing the burden of proof on the prosecution or the defendant. The Legislature has resolved that issue by enacting Evidence Code section 522.

[14]Drew would also be entitled to an order directing the trial court to find him insane if the evidence at the sanity trial demonstrated that he was insane as a matter of law under the ALI test. The defense witnesses, however, failed to direct their testimony to the issues critical in establishing insanity under the ALI test; in consequence the record on appeal is insufficient to prove insanity as a matter of law under that test.

is supported by the record. We therefore explain our conclusion that on the present record a jury instructed under the M'Naghten rule could reasonably reject the opinions of psychiatric witnesses; finding that Drew had thus failed to prove his lack of understanding of the nature or wrongfulness of his act, the jury accordingly could return a verdict of sanity.

Drew relies on the fact that both court-appointed psychiatrists testified that he was unaware of the wrongfulness of his assault. The jurors, however, are not automatically required to render a verdict which conforms to the expert opinion. We explained in *People* v. *Wolff, supra,* 61 Cal.2d 795, that: "However impressive this seeming unanimity of expert opinion may at first appear . . . our inquiry on this just as on other factual issues is necessarily limited at the appellate level to a determination whether there is substantial evidence in the record to support the jury's verdict of sanity . . . under the law of this state. [Citations.] It is only in the rare case when 'the evidence is uncontradicted and entirely to the effect that the accused is insane' (*In re Dennis* (1959) 51 Cal.2d 666, 674 [335 P.2d 657]) that a unanimity of expert testimony could authorize upsetting a jury finding to the contrary." (61 Cal.2d at p. 804.) Indeed we have frequently upheld on appeal verdicts which find a defendant to be sane in the face of contrary unanimous expert opinion. (See *People* v. *MacPherson* (1970) 2 Cal.3d 109, 114 [84 Cal.Rptr. 129, 465 P.2d 17]; *People* v. *Coogler* (1969) 71 Cal.2d 153, 166 [77 Cal.Rptr. 790, 454 P.2d 686]; *People* v. *Ford* (1966) 65 Cal.2d 41, 55 [52 Cal.Rptr 228, 416 P.2d 132]; *People* v. *Wolff, supra,* 61 Cal.2d 795, 803-804, and cases there cited; *People* v. *Ruiz* (1970) 11 Cal.App.3d 852, 858 [82 Cal.Rptr. 408].)

In *People* v. *Coogler, supra,* 71 Cal.2d 153 [77 Cal.Rptr. 790, 454 P.2d 686], we pointed out that "The chief value of an expert's testimony in this field, as in all other fields, rests upon the *material* from which his opinion is fashioned and the *reasoning* by which he progresses from his material to his conclusion." (71 Cal.2d at p. 166, quoting *People* v. *Bassett* (1968) 69 Cal.2d 122, 141 [70 Cal.Rptr. 193, 443 P.2d 777].) (Italics in original.) In the present case the jurors might well note that both experts were unfamiliar with Drew's conduct during the four years following his release from Patton State Hospital, and that their subsequent examinations of him were relatively brief. More significantly, the jurors could note that although both psychiatrists stated an opinion that Drew did not appreciate the wrongfulness of his act, nothing in their testimony explained the reasoning which led to this opinion. Although the psychiatric testimony described Drew's repeated aggressive acts, and

diagnosed his condition as one of latent schizophrenia, neither psychiatrist explained why that behavior and diagnosis would lead to the conclusion that Drew was unable to appreciate the wrongfulness of his aggressive acts.

The prosecution presented no evidence at the sanity trial. Defendant, however, has the burden of proof on the issue of insanity; if neither party presents credible evidence on that issue the jury must find him sane. Thus the question on appeal is not so much the substantiality of the evidence favoring the jury's finding as whether the evidence contrary to that finding is of such weight and character that the jury could not reasonably reject it. Because the jury could reasonably reject the psychiatric opinion that Drew was insane under the M'Naghten test on the ground that the psychiatrists did not present sufficient material and reasoning to justify that opinion, we conclude that the jury's verdict cannot be overturned as lacking support in the trial record.

Our conclusion that the jury could reasonably find Drew sane under the M'Naghten rule, however, is itself a commentary on the inadequacy of that rule. In order to meet his burden of proof under M'Naghten, defendant had to prove his lack of cognitive capacity at the moment of the assault. This condition, however, is not a matter which psychiatrists can detect by testing or interview; neither is such cognitive incapacity a characteristic symptom of defendant's illness. The psychiatric account of the history and characteristics of Drew's illness does not bear directly on his ability to understand the difference between right and wrong *because* that alleged inability is not a relevant psychiatric fact. In sum, inadequacy of the expert evidence to prove insanity under the M'Naghten rule is essentially the result of the fact that M'Naghten requires proof of a subjective cognitive state which is largely unrelated to the reality of mental illness.

5. *Disposition of this appeal.*

■ It is not surprising that in view of the fact that we had not then endorsed the ALI test of mental incapacity neither witnesses nor counsel structured their presentation at trial in terms of the ALI test, and the court did not instruct the jury on that standard. The record on appeal, nevertheless, adduces substantial evidence of incapacity under the ALI criteria. His pattern of repetitive irrational assaults suggests the likelihood that he is unable to control his behavior to conform to legal requirements. His incapacity to control his behavior, moreover, is psychologically

relevant to the diagnosis and treatment of his condition; thus the defense psychiatrists, who observed Drew's behavior and succeeded temporarily in controlling it through medication, might well have been able to state and support an opinion that he was insane under the ALI test. In view of the absence of prosecution evidence on the insanity issue, we conclude that if the case had been tried under the ALI standard and the jury instructed accordingly, it probably would have returned a verdict finding Drew insane. The trial court's failure to employ the ALI test therefore constitutes prejudicial error.[15]

Finally, we recognize that in setting out a legal test to decide whether or not a person is insane we deal in a matter so delicate and obscure that it cannot be captured in a perfect definition. Yet because of the grave, and often life and death consequences that follow from a decision as to the sanity of an offender, we are surely enjoined to spare no effort to frame the best standard that is currently extant. We cannot justify the retention of a test based upon the single factor of recognition that has been abandoned by almost all the experts in the field and that has been rejected by all except one of the federal circuits and by an impressive number of state courts.

Nor can we escape our obligation by relegating the problem to the Legislature in face of the fact that the M'Naghten test is a court-made test that this court itself has adopted and at times reiterated and at other times amended and variously construed. We cannot continue to cast human beings in an ancient and discarded psychological mould. We must at least to the best of our limited ability accept the reality of the human psyche, as expert opinion depicts it, and bring the law as close as possible to an appraisal of the human being. We must recognize in certain cases his substantial incapacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. In judgment upon the sanity of the fragile and often inadequate human being we cannot be frozen into a stereotyped, rejected formula of the past.

The judgment is reversed and the cause remanded for a new trial on the issue raised by defendant's plea of not guilty by reason of insanity.

Bird, C. J., Mosk, J., and Newman, J., concurred.

---

[15]In his brief to the Court of Appeal Drew contended that his conviction for battery was not supported by substantial evidence. That contention is plainly without merit, and was not raised in his petition for hearing. Drew's further contention that the trial court erred in not stating its reasons for denying him probation is precluded by our decision in *People* v. *Edwards* (1976) 18 Cal.3d 796 [135 Cal.Rptr. 411, 557 P.2d 995].

**MOSK, J.**—I concur in the well-reasoned majority opinion.

In response to the criticism of the dissent that in some cavalier manner we are encroaching upon the legislative preserve, I repeat the conclusion advanced in my separate concurring opinion in *People* v. *Kelly* (1973) 10 Cal.3d 565, 578 [111 Cal.Rptr. 171, 516 P.2d 875]: the M'Naghten rule must be abandoned, the Legislature is invited to adopt a substitute therefor whenever it considers Penal Code revision, and trial courts are directed *in the interim* to adhere to the ALI formula (*id.,* at p. 582).

**RICHARDSON, J.**—I respectfully dissent. My objection to the majority's approach may be briefly stated. I believe that a major change in the law of the type contemplated by the majority should be made by the Legislature. Although variously phrased, this has been the consistent, firm, and fixed position of this court for many years for reasons equally as applicable today as when first expressed.

Twenty-five years ago Justice Carter speaking in *People* v. *Daugherty* (1953) 40 Cal.2d 876, 894 [256 P.2d 911], said of a defendant's effort to change the evolving California M'Naghten test that it "has been the rule since the first decision in this state . . . has been followed consistently . . . is the generally accepted rule . . . and if it is to be changed his argument should be addressed to the Legislature." Justice Spence, speaking for a unanimous court in *People* v. *Berry* (1955) 44 Cal.2d 426, 433 [282 P.2d 861], and referring to a defendant's challenge to the M'Naghten test, observed "However, regardless of the doubtful merit of defendant's suggestion as a generally workable test, if any change is to be made in the accepted standard for determining guilt in relation to the insanity plea, the arguments for such change should be addressed to the Legislature rather than to the courts." In 1959 it was Justice Schauer's turn to speak, and in *People* v. *Nash* (1959) 52 Cal.2d 36, 48-49 [338 P.2d 416], he amplified the principle: "Since 1953 (when we decided Daugherty) and in 1955 (when we decided Berry) the criticisms of M'Naughton and the reasons for our conclusion that applications for alteration of the rule should be addressed to the Legislature have not significantly changed. A proposal of defense counsel points up reason for our previous and continued reluctance to assume the expertise which would be required to formulate new standards . . . . [Referring to a defense counsel's proposed reexamination of M'Naghten] [t]he advancement of this proposal indicates that the reexamination should be by the Legislature, which is equipped for fact-finding, rather than by this court, which is traditionally

disinclined and functionally not equipped to perform the fact-finding operation."

Interestingly, although Justice Schauer in *Nash* spoke for only six members of the court, the seventh member, Justice Peters, in his concurrence commended the author of the majority opinion and, on the point before us, added, "I agree with his conclusion that, if there is to be a change in the rule of the M'Naughton case, it should be made by the Legislature and not by this court." One year later Justice Schauer, again speaking for a unanimous court, said, "The history of the judicial and implicit legislative acceptance of M'Naughton in this state is related in the Nash case [citation]. Nothing which defendant says in the present case convinces us that we should depart from the view that, whatever we may think of the theoretic soundness of the M'Naughton tests, such *tests have in effect become an integral part of the legislative scheme for the appraisal of criminal responsibility in California and any change therein should come from the Legislature.*" (*People* v. *Rittger* (1960) 54 Cal.2d 720, 732 [7 Cal.Rptr. 901, 355 P.2d 645], italics added.)

Two years later it was Justice White again speaking for the entire court in *People* v. *Darling* (1962) 58 Cal.2d 15, 22-23 [22 Cal.Rptr. 484, 372 P.2d 316], who repeated the above *Nash* quotation adding in response to an appeal that we adopt the so-called *Durham* rule that "This court, however, has consistently rejected such contentions, holding that changes, if any, are legislative matters . . . . We are not persuaded by the arguments advanced in the case with which we are here concerned that the issue is now a judicial rather than a legislative one." Justice Schauer in *People* v. *Wolff* (1964) 61 Cal.2d 795, 803 [40 Cal.Rptr. 271, 394 P.2d 959], in reexpressing the *Rittger* principle above italicized, emphasized the existence of a unique California M'Naghten rule adding that, ". . . in evolving our own rule to meet statutory requirements, apply humane concepts, and at the same time protect society, we have reformulated the test with a variety of specifications to achieve this end." (P. 800.)

This unbroken succession of decisions since *People* v. *Coffman* (1864) 24 Cal. 230, in 1864 has accepted the evolving M'Naghten rule and acquiescence by the Legislature as an integral part of California's legislative scheme. We have consistently declined invitations to discard it in favor of other proposed rules for the reason, repeatedly expressed, that the Legislature is far better equipped than we, in its fact-finding capacity, to make any appropriate modifications. This principle had become so very well settled that just five years ago, by a vote of six to one, we

applied the modified M'Naghten test without even responding to the dissenting opinion which urged adoption of the American Law Institute (ALI) standard. (*People* v. *Kelly* (1973) 10 Cal.3d 565 [111 Cal.Rptr. 171, 516 P.2d 875].)

In support of our conclusion that the Legislature has tacitly approved the M'Naghten test and that adoption of a different formulation is a matter for legislative action, we expressly noted in *People* v. *Nash, supra,* 52 Cal.2d 36, that the Legislature's "use of the judicially construed word insanity [in 1872 and 1927] in legislation on that subject indicated its intent that the [judicial] definition should be continued . . . ." (P. 47.) We have been consistently sensitive to legislative interest in the subject. In *People* v. *Wolff, supra,* for example, one of the reasons given for our continued judicial restraint was that, "Indeed, the entire problem is currently under consideration" by the Legislature. (61 Cal.2d at p. 803.)

Although the majority declines to acknowledge the point, the foregoing considerations, noted in *Wolff,* are fully applicable today: There is presently pending before the Legislature a specific proposal to amend the Penal Code by adopting new section 3302, subdivision (a), which would provide that "A person is not criminally responsible for an offense if, at the time of the offense, as the result of a diseased or deranged condition of the mind he lacked the sufficient capacity to know or understand the nature and quality of his act, or to know or understand that his conduct was wrong." (Sen. Bill No. 27 (1977-1978 Reg. Sess.) § 1.) The foregoing proposal was drafted as part of a project by a joint legislative committee to revise the Penal Code. The committee has conducted numerous hearings and has had the benefit of considerable staff and advisory services from the academic community. Significantly, the proposed section appears to be a legislative affirmation of our insanity definition in *People* v. *Wolff.*

When the Legislature is considering a legislative codification of the modified M'Naghten test, as described in *Wolff,* it seems to me highly inappropriate, in the light of our prior repeated insistence that this is an area of primarily *legislative* responsibility, for us now to ignore legislative interest and to adopt, judicially, a new test for determining criminal responsibility. This is an excellent time for us to exercise judicial restraint. We have been consistently correct in our frequent assessments that the Legislature is much better equipped functionally than are we to undertake the fact-finding determination and to make those changes in California's modified M'Naghten test of criminal insanity.

The majority in proposing the ALI test insists that "we are surely enjoined to spare no effort in attempting to frame the best criteria that is currently extant." (*Ante,* p. 352.) By adopting the ALI test, however, the majority of course does no "framing" whatever. Without change it simply adopts wholesale the ALI formula. The majority now proposes to abandon both deference to legislative interest and a carefully constructed accretion of California law and opt for an entirely different standard. Suddenly, "The task of describing the circumstances under which mental illness will relieve a defendant of criminal responsibility *has become the duty of the judiciary.*" (*Ante,* p. 340, italics added.) It seems fair to ask, *when* since 1973 (*People* v. *Kelly, supra*) did this become *our* duty? *Why* has it now become our duty? *What* additional "fact-finding" powers do we now possess? The answer to the last question, of course, is none. Frankly, and I say this with complete respect, there is only one explanation for this judicial U-turn, namely, impatience. The majority, wearied of waiting, and browsing among the varied offerings at a judicial smorgasbord, has picked the ALI formulation. There may be merit in the choice, but a decision to adopt it or any other proposed test and thereby abandon the carefully structured California rule, already a substantial "recast" of the original M'Naghten rule and *"an integral part of the legislative scheme,"* should be preceded by a much more extensive factual investigation and analysis than we are able to perform.

Furthermore, it should be observed that from the table the majority has selected warmed over food. The choice of the majority has been around awhile. Indeed, the ALI test in Tentative Draft No. 4, section 4.01, page 27, Model Penal Code, provided: "(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." This language is almost precisely the test that is adopted by the majority herein. It is significant that we flatly rejected this test almost 20 years ago in *People* v. *Nash, supra,* 52 Cal.2d 36, 48, footnote 7, because we said that the Legislature was equipped, and we were not, "to perform the fact-finding operation." We are told that, in the almost 20 years since we declined to accept it in *Nash,* 15 states have adopted the ALI test, indicating of course that 35 states have not. Moreover, of the 15 states, 8 have done so by *legislative* enactment, and only 1 state, Alaska, has adopted it judicially in the past 8 years. This can hardly be described as either a marked or inevitable trend, and suggests a very widespread skepticism as to the ALI test. The substantial majority of the states,

including California, has been studying it legislatively and judicially for many years and has thus far refused to adopt it.

Other proposed formulations have gained momentary interest, but have been generally abandoned. These include the so-called *New Hampshire* (*State* v. *Pike* (1869) 49 N.H. 399; *State* v. *Jones* (1871) 50 N.H. 369) or the *Durham* rule (*Durham* v. *United States* (D.C.Cir. 1954) 214 F.2d 862) or that test contained in the proposed federal criminal code. As noted, the Legislature is presently contemplating still another formulation. We are not equipped to pick and choose the best among the various alternatives that are available, and we should leave the task to those who are so equipped. A legislative committee aided by staff can conduct hearings and studies, question experts, and develop a policy consensus on the questions of fact or mixed questions of fact and law that are involved.

Such a legislative inquiry doubtless will reveal that the ALI test is not without its critics. Indeed, in its desire to abandon the modified California test, the majority accepts a proposed new rule which may well create an entirely new set of problems. The Legislature's refusal thus far to adopt the ALI rule may result from its wish to learn from the English experience. As simply one illustration, it should be noted that a 1975 study of the British Home Office, Department of Health and Social Security, entitled Report of the Committee on Mentally Abnormal Offenders (hereafter cited as Report) dealt with the specific question of the extent to which mental disorders should constitute defenses to criminal charges. In devising its own proposed test the committee carefully considered but rejected the ALI test for reasons suggesting that it is not, to use the majority's term, the "best criteria currently extant."

The English committee focused on the ALI's use of the term "*mental disease or defect*" and noted that such a vague undefined expression does not help to distinguish between minor and major disorders. The term has been abandoned in Britain for several years. This may be the case in the United States as well. Furthermore the Report notes that the ALI test, as with the so-called *Durham* rule, leaves the interpretation of "mental disease or defect" with "psychiatrists who give evidence to the court." The Report observes that this fact prompted the author of the *Durham* rule, Judge Bazelon, to abandon *Durham* with this comment: "In the end, after 18 years, I favored the abandonment of the Durham rule because in practice it had failed to take the issue of criminal responsibility away from the experts. Psychiatrists continued to testify to the naked conclu-

sion instead of providing information about the accused so that the jury could render the ultimate *moral* judgment about blameworthiness. Durham had secured little improvement over M'Naghten." (Bazelon, *Psychiatrists and the Adversary Process,* Scientific Am. (June 1974) p. 230, italics added.)

The committee then opines that the emphasis on capacity "to conform," which appears to be the only attractive portion of the ALI test, presents some very considerable additional problems, saying: "The Model Penal Code [ALI] proposal is open to the same objection as Durham in its reference to 'mental disease or defect,' but its second limb raises other problems. In particular the test of capacity to conform has to face a well-known philosophical criticism. How can one tell the difference between an impulse which is irresistible and one which is merely not resisted? Let us imagine two patients whose clinical symptoms appear similar, each of whom has been involved with a friend in an argument. Patient A flies into a rage and stabs his friend: patient B does not. If A is prosecuted, a psychiatrist may be ready to testify that by reason of his disease of the mind he was deprived of the capacity to conform to the law, and he will no doubt be influenced by the fact that A did not conform to it. Patient B, not having assaulted his friend, is not prosecuted, so that no court hears psychiatric evidence about his capacity to conform: but presumably a psychiatrist would say that he had such a capacity, since he did not strike his friend. Some would seek to find a way out of this argument. There are offenders whose lack of self-control shows itself not only in a single offence, but also in their response to everyday temptations or frustrations. If patient A had a history of frequent and violent loss of temper, or if under observation after the assault he reacted violently to petty frustrations in the ward, such evidence would support the claim that he is less able than most men to control his temper. If, on the other hand, he was known to be extremely self-controlled, a psychiatrist would be justified in assuming that at normal times he was able to control himself and would have to explain the assault in some other way, for example, by showing that the argument developed in such a way as to give him extreme provocation (as the psychiatric witness did in the California case of [People v.] Gorshen [(1959) 51 Cal.2d 716]). To this argument the determinist would reply that the fact remains that the man who was normally able to control himself (i.e., who normally conformed) was not able to control himself on the occasion in question, as is shown by the fact that he did not conform. Also, even the psychopath or schizophrenic who is often aggressive is not *always* aggressive, so that aggression on a particular occasion is not completely

explained by the psychopathy or schizophrenia. *However this may be, it will generally be agreed that most cases are of the intermediate sort in which neither the circumstances nor the offender's usual behavior provided the obvious explanation; and in such cases it is usually fair to say that the only evidence of incapacity to conform with the law was the act itself.*" (Report, pp. 221-222, italics added.)

The majority in its uncritical acceptance has given no analytical consideration to problems of the type which have caused the English to reject the ALI rule. Furthermore, it seems fundamental that any "insanity" test should ideally and to the extent possible avoid the use of ambiguous standards which may be subject to varying interpretations and meanings. The ALI test includes such vague terms as "mental disease or defect," "substantial capacity," "appreciate criminality," and "conform conduct." Additionally, any proposed test should limit the extent to which psychiatrists, in Judge Bazelon's language, may "testify to the naked conclusion" about criminal responsibility. As stressed in the new English formulation, the proposed test seeks to "(a) avoid the use of medical terms about which there may be disputed interpretations or whose meaning may change with the years; and (b) be such as to allow psychiatrists to state the facts of the defendant's mental condition without being required to pronounce on the extent of his responsibility for his offence. Degrees of responsibility are legal, not medical, concepts." (Report, p. 222.) The ALI test does very little to assist in either critical area. Its primary appeal is that it is different.

Professor Richard Gambino, professor of educational philosophy, Queens College, in a current article entitled *The Murderous Mind: Insanity v. The Law* ((Mar. 18, 1978) Saturday Review, at p. 10) traces the origins of the M'Naghten rule, and of various suggested changes in the light of more modern scientific knowledge. Professor Gambino stresses the extreme difficulty in meshing the different disciplines of psychiatry and the law, each possessing as it does its own variant definitions and standards. He emphasizes that "Psychiatry is a healing art. Its function is to understand and cure, not to define moral or legal responsibility or to accomplish justice. In fact, the profession of psychiatry does not use or recognize the terms 'sanity' and 'insanity.' They are strictly legal terms." On the point before us, his assessment of the experience with the majority's proposed ALI test is not encouraging. After describing the M'Naghten and Durham rules and their limitations he concludes, "In 1961, the American Law Institute recommended a new test, which was a merger of the M'Naghten and Durham rules. *Unfortunately, it has served*

*little purpose except to compound the difficulties of both standards."* (P. 10, italics added.)

The formulation of intelligent rules covering the assertion of insanity as a criminal defense is a very complex problem. This fact underscores the wisdom of judicial restraint. Professor Gambino cites 2 interesting experiments conducted at Stanford University in 1972 which illustrate the disturbing uncertainties which persist 135 years after M'Naghten. He reports that "Eight researchers feigned hearing 'voices' and gained admission to 12 different psychiatric hospitals. None of the eight falsified their real life history, except for the voices, nor did any of them have a history of pathological behavior. Yet in 11 of the 12 instances, the researchers were diagnosed as 'schizophrenic,' while in the twelfth, the diagnosis was 'manic depressive.' Although other patients regarded the researchers as normal, no member of the hospitals' staff did. Then, in a follow-up experiment, the staff of a psychiatric hospital were told that one or more fake patients would be sent to them. Although none were actually sent, 41 of 193 patients admitted for treatment in the following period of time were thought to be fakes, in each case by at least one member of the hospital's staff." While the examples may be extreme, they do caution a judicial "go slowly" approach in this area. Assuming, as we may, the validity of the majority's contention that in the 135 years since M'Naghten there have been many psychiatric advances, the Legislature is thoroughly justified in taking a very long and careful, indeed skeptical, look before jettisoning the existing and carefully evolved body of law which now composes the California M'Naghten rule as illustrated by *Wolff.* (61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959].)

I have no doubt that further improvements may be made in the techniques used to resolve the difficult issue of insanity as a defense in criminal cases. This goal is much more likely to be achieved, in my opinion, through a fact-finding process which enlists the aid of experts in the relevant disciplines who have given careful and close study to this very troublesome problem. I believe that this is what the Legislature is attempting in its evaluation of the critical medical-legal dialogue. It is a slow process. Undoubtedly, professional disagreements will appear, but as in many comparable areas there may well emerge a responsible consensus which would, by providing guidance to the Legislature, make possible a reasoned improvement over the present California rule. Such a legislative process, as repeatedly described by us, is to me a much sounder approach than that adopted by the majority which, disregarding legislative attention, chooses its own formulation predicated primarily

and essentially upon judicial instinct, second-hand sources, and appellate argument.

I would affirm the judgment.

Clark, J., and Manuel, J., concurred.

**CLARK, J.,** Dissenting.—While fully concurring in Justice Richardson's dissenting opinion, I am compelled to emphasize the significance of the majority's holding. Today's majority opinion shatters California's intricate and enlightened system of criminal responsibility, replacing it with a vague behavioral test to be determined by court psychiatrists. The venerable equations of right versus wrong, good versus evil, go down in favor of an experiment determining criminal conduct by probing a defendant's metaphysical thought process. (See, Platt & Diamond, *The Origins of The "Right and Wrong" Test of Criminal Responsibility* (1966) 54 Cal.L.Rev. 1227.) Worse, the majority orders its new rule to apply retroactively, requiring retrial of dozens, if not hundreds, of criminal cases.

Why? Our Constitution does not require the change, the Legislature does not mandate it, neither party to this case requests it. It was raised by the author of the majority opinion apparently because, as Justice Richardson points out in his dissenting opinion, "its primary appeal is that it is different."

The majority has charged our coequal branch of government with "legislative inaction" citing *Marvin* v. *Marvin,* 18 Cal.3d 660, 681 [134 Cal.Rptr. 815, 557 P.2d 106], among other cases for authority to create today's liberalized code of conduct; it might be hoped that the legislative response will be swift and certain in restoring our state's established system of mental defenses.

Respondent's petition for a rehearing was denied November 1, 1978. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.