[No. E002239. Fourth Dist., Div. Two. May 13, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
MARY HELEN GUTIERREZ, Defendant and Appellant.

**COUNSEL**

David L. McKenna, Public Defender, Jane A. Lawrence and Littleton M. Gunn, Deputy Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, John W. Carney and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RICKLES, Acting P. J.**—Defendant Mary Helen Gutierrez was convicted by jury of three counts of inflicting cruel or inhuman injury upon a child (Pen. Code, § 273d). Defendant was sentenced to state prison for a term of five years but execution of sentence was suspended and probation was granted on various conditions. Defendant has appealed from the judgment.

Two related issues are raised on appeal: whether the trial court erred in excluding evidence of defendant's mental illness at the time of the offenses and whether the court erred in imposing on defendant the burden of proving the cause of her mental condition.

### FACTS

Defendant (age eighteen years) was living with her three children: Crystal (age three years), Daniel (age two years), and Steven (age two months). On July 21, 1984, defendant was staying at her parents' house while they took a trip to Las Vegas. During the afternoon, defendant began beating her children and the police were summoned. When the officers arrived, about 5 p.m., defendant was being physically restrained by neighbors and relatives. Crystal, her daughter, had swollen lips and was swollen around the eyes. Daniel had bruises, bumps and dried blood on his face and neck. Steven, the infant, also had bruises and drying blood on his face; he appeared to be unconscious.

Defendant was arrested and taken to a hospital for a blood test, after which she was taken to the police department where she waived her *Miranda* rights and gave a tape-recorded interview. Defendant admitted hitting, slapping, squeezing, and kicking her children. Her explanation for this conduct was bizarre and inconsistent. She referred to hearing voices, to thinking there was a bird inside her children, or a tire tube, or an older person. At times she said she did not know why she had beaten her children, at other times she said she was trying to force the things inside of them to come out.[1]

Defendant was found to be incompetent to stand trial and was committed to the custody of the State Department of Health. She was placed in Patton State Hospital on October 2, 1984. On January 24, 1985, defendant was found to be mentally competent to stand trial and criminal proceedings were reinstated.

---

[1]A transcript of the most relevant part of the interview is attached to this opinion as an appendix.

Following her arraignment on the information, defendant entered pleas of not guilty and not guilty by reason of insanity. On the date set for trial, defendant elected, against the advice of her attorney, to withdraw her plea of not guilty by reason of insanity. A hearing was held at which testimony was received from Dr. Harvey Oshrin, a psychiatrist. In his opinion, any mental illness which defendant may have had was a consequence of intoxication with a variety of illicit substances. After she was taken into custody, her system had cleared and her mental condition likewise had cleared. She was competent to make a rational judgment to withdraw her plea of not guilty by reason of insanity.

Following this hearing the trial court approved the change of plea. During voir dire of the jury, the prosecutor objected to questions posed by defense counsel regarding state-of-mind evidence. Argument on this question continued during voir dire and during presentation of the prosecution's case-in-chief. The trial court ruled that defendant would not be permitted to introduce evidence of mental illness or voluntary intoxication but she would be permitted to introduce evidence of a reasonable mistake. More specifically, defendant would not be permitted to call expert witnesses to testify regarding her mental condition or to introduce evidence from any source regarding her history of mental illness. She would not be permitted to introduce evidence of her appearance, statements or conduct before or after the offenses to prove the existence of a mental illness at the time of the offenses. She would not be permitted to introduce evidence of her voluntary ingestion of drugs or other intoxicating substances. Defendant would be permitted to testify regarding her mental state at the time she was beating her children.

The only defense witness was defendant herself and her testimony was brief. She said she started seeing her children as birds on the day in question and "didn't know they were children at that time." She had just wanted to kill the birds because she felt they were an evil force.

## DISCUSSION

Before considering defendant's contentions, a brief review of the distinction between general and specific intent crimes will be helpful. Defendant concedes she was charged with and convicted of general intent crimes.

 "When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve

some additional consequence, the crime is deemed to be one of specific intent. There is no real difference, however, only a linguistic one, between an intent to do an act already performed and an intent to do that same act in the future." (*People* v. *Hood* (1969) 1 Cal.3d 444, 456-457 [82 Cal.Rptr. 618, 462 P.2d 370].)

■ "The distinction between specific and general intent crimes evolved as a judicial response to the problem of the intoxicated offender. That problem is to reconcile two competing theories of what is just in the treatment of those who commit crimes while intoxicated. On the one hand, the moral culpability of a drunken criminal is frequently less than that of a sober person effecting a like injury. On the other hand, it is commonly felt that a person who voluntarily gets drunk and while in that state commits a crime should not escape the consequences. [Citation.]

"Before the nineteenth century, the common law refused to give any effect to the fact that an accused committed a crime while intoxicated. The judges were apparently troubled by this rigid traditional rule, however, for there were a number of attempts during the early part of the nineteenth century to arrive at a more humane, yet workable, doctrine. . . . To limit the operation of the doctrine and achieve a compromise between the conflicting feelings of sympathy and reprobation for the intoxicated offender, later courts both in England and this country drew a distinction between so-called specific and general intent crimes." (*People* v. *Hood, supra,* 1 Cal.3d at pp. 455-456.)

Evidence of voluntary intoxication may be introduced to show the absence of specific intent but not to show the absence of general intent. (See Pen. Code, § 22.) Because specific intent crimes are usually more serious than general intent crimes and because there is usually, though not invariably, a general intent crime available as an alternative to each specific intent crime (see *People* v. *Wetmore* (1978) 22 Cal.3d 318, 327-330 [149 Cal.Rptr. 265, 583 P.2d 1308]), the system normally works to mitigate the culpability of the voluntarily intoxicated defendant without permitting complete exoneration. A defendant charged only with a general intent crime derives no benefit from the rule but intoxication may still be considered as a mitigating factor for sentencing purposes. (Cal. Rules of Court, rule 423(b)(2).)

Thus the distinction between general intent and specific intent crimes is at bottom founded upon a policy decision regarding the availability of certain defenses. ■ This is illustrated by the rule that voluntary intoxication is not a defense to a general intent crime even though the intoxication results in unconsciousness. (*People* v. *Kelly* (1973) 10 Cal.3d 565, 573 [111 Cal.Rptr. 171, 516 P.2d 875].)

■ Mental illness poses a policy dilemma similar in many respects to that of voluntary intoxication. (See *People* v. *Wells* (1949) 33 Cal.2d 330, 357 [202 P.2d 53].) A defendant who pleads and proves insanity is totally absolved of criminal responsibility although subject to civil confinement. If the defendant chooses not to enter an insanity plea, or if the evidence is not sufficient to establish insanity, then sympathy toward the mentally ill defendant must be balanced against the considerations that such a person, being either legally sane or having voluntarily relinquished an insanity defense, may not be entirely blameless and may present a continuing public danger. Accordingly, the rule has developed that evidence of mental illness may be offered to show the absence of specific intent but not to prove the absence of general intent. (*People* v. *Drew* (1978) 22 Cal.3d 333, 344 [149 Cal.Rptr. 275, 583 P.2d 1318]; *People* v. *Gauze* (1975) 15 Cal.3d 709, 719 [125 Cal.Rptr. 773, 542 P.2d 1365]; *People* v. *Noah* (1971) 5 Cal.3d 469, 477-478 [96 Cal.Rptr. 441, 487 P.2d 1009]. See also, *People* v. *Wells, supra,* 33 Cal.2d at pp. 346-347; *People* v. *Whitler* (1985) 171 Cal.App.3d 337, 340-342 [214 Cal.Rptr. 610].)

■ Defendant in the present case, having conceded she was charged with general intent crimes, insists nevertheless that she should have been permitted to introduce evidence "concerning her mental problems, deficiencies or delusions." She freely admits the crimes were committed "under a gross delusion which was the product of a severe mental disorder." In support of her contention, defendant relies on the opinion of this Division in *People* v. *Scott* (1983) 146 Cal.App.3d 823 [194 Cal.Rptr. 633].

The defendant in *Scott* began hallucinating after attending a party where he drank punch which evidently had been laced with a hallucinogenic substance without his knowledge. While under the influence of this substance, the defendant attempted to commandeer certain vehicles. On appeal from his conviction of two counts of attempted unlawful driving or taking of a vehicle (Pen. Code, § 664, Veh. Code, § 10851), we reversed, holding that the evidence established as a matter of law the defense of reasonable mistake of fact:

"Subdivision Three (formerly subd. Four) of Penal Code section 26 includes among persons incapable of committing a crime, 'Persons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent.' It is clear that in attempting to commandeer the vehicles defendant acted under a mistake of fact: he thought he was a secret government agent acting to protect his own life or possibly that of the President. When a person commits an act based on a mistake of fact, his guilt or innocence is determined as if the facts were as he perceived them. [Citation.] If in fact defendant were a government

agent and either his life or the life of the President were in danger and defendant attempted to commandeer the vehicles for the purpose of saving his own life or that of the President, his actions would have been legally justified under the doctrine of necessity. [Citations.]

"Penal Code section 26 does not expressly require that the vitiating mistake be reasonable, but we may assume for purposes of this decision that it must. [Citations.] Although defendant's mistake of fact was un-doubtedly irrational, it was also undoubtedly reasonable under the circum-stances, because the circumstances include that the mistake emanated from a delusion caused by defendant's involuntary intoxication resulting from unknowingly ingesting some unspecified hallucinogenic substance." (*People* v. *Scott, supra,* 146 Cal.App.3d at pp. 831-832, fns. omitted.)

*Scott* is readily distinguishable from the present case. The defendant in *Scott* was not mentally ill—his delusions were caused solely by intoxication which was concededly involuntary. In the present case, by contrast, de-fendant's abnormal mental state was caused either by voluntary intoxication or by mental illness, or by some combination of the two. There was no hint of involuntary intoxication.

Our discussion in *Scott* was carefully limited to the facts presented. *Scott* expressly stated that the mistake-of-fact defense would not have been avail-able if the delusions had been caused by voluntary intoxication. (*People* v. *Scott, supra,* 146 Cal.App.3d at p. 832, fn. 4. See also, *People* v. *Guthreau* (1980) 102 Cal.App.3d 436, 443 [162 Cal.Rptr. 376].)

While the relationship between mental illness and the mistake-of-fact defense was not expressly addressed in *Scott,* the opinion notes that the defense is available only where the mistake of fact was *reasonable* under the circumstances. (See also, *People* v. *Mayberry* (1975) 15 Cal.3d 143, 154-157 [125 Cal.Rptr. 745, 542 P.2d 1337]; *People* v. *Rivera* (1984) 157 Cal.App.3d 736, 742-743 [203 Cal.Rptr. 842].) While involuntary intoxi-cation is a circumstance which may be considered in determining reason-ableness, mental illness is not. (*People* v. *Raszler* (1985) 169 Cal.App.3d 1160, 1163-1165 [215 Cal.Rptr. 770].)

There are sound policy reasons for refusing to permit a mistake-of-fact defense based on delusions which are products of mental illness.

The same policy reasons which prevent use of evidence of mental illness to prove the absence of general intent apply to prevent use of the same evidence under the guise of an affirmative mistake-of-fact defense. A de-fendant who commits criminal acts while under a temporary delusion caused

by involuntary intoxication is neither morally blameworthy nor a menace to the community and therefore may appropriately use the mistake-of-fact defense to obtain complete exoneration. The same cannot be said of the mentally ill defendant who may represent a continuing threat and who may be blameworthy to some degree, although perhaps not as much as a completely sane individual. The position of the mentally ill defendant has been accommodated by providing for the NGI plea, by allowing evidence of mental illness to prove the absence of specific intent, and by permitting consideration of mental illness as a mitigating factor for sentencing purposes. This carefully balanced system would be subverted, and the legitimate ends of criminal justice frustrated, if irrational delusions caused by mental illness could provide a complete defense to general intent crimes by presenting them under the label of mistake of fact.

The court's ruling excluding evidence of mental illness other than defendant's testimony regarding her state of mind at the time of the offenses did not have the effect of shifting the burden of proof. The ruling merely excluded evidence which was not relevant because it did not tend to establish any defense to the charged offenses.

The trial court did not err in excluding evidence of defendant's mental illness.

The judgment is affirmed.

Kaufman, J., and Cramer, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied August 14, 1986. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.

## APPENDIX

"A . You know, tell me something, is there a cure for some voices that you been hearing for awhile?
"Q. Is there what?
"A. A cure for voices I hear?
"Q. Is there a cure for voices? Yeah. Uh-huh.
"A. How, how's that?
"Q. You, you need to see a doctor, a mental health doctor.

*Assigned by the Chairperson of the Judicial Council.

"A. I've been seeing a mental health doctor, but he refused to see me, you know, there was a couple reason I couldn't make it, I don't know why but, there were persons that talk to me tell me that I wouldn't make it there and I didn't.

"Q. That you wouldn't make it where?

"A. And then there's days, over there, to see the doctor. And then there's days I hear my baby crying. But I know how owls sound, you know, and that's what I heard today. And I wanted to kill it. And I was hitting my baby and I felt a tube tire in him and I didn't want that in him. That's why I know my baby's bruises will go away.

"Q. Yeah, there is a cure for it, yeah. Okay, so you stayed overnight on Friday. When you stayed overnight who was there. You had your three kids with you?

"A. Yeah.

"Q. Um, and Maria was there too?

"A. Yeah, and my sister and her little girl.

"Q. Okay. (Unintelligible) and (unintelligible) were you awake when your mom and dad left this morning? Or when you woke up with (unintelligible).

"A. No, I was asleep.

"Q. So when you woke up they were gone, you were there at the house by yourself with four kids now?

"A. Uh-huh.

"Q. So what have you done today? Tell me what you've done since you got up this morning? What time did you wake up?

"A. I woke up around 10:00 and I stayed up and I was playing with my kids, not at 10:00, around 12:00, and I was playing with my kids and all of a sudden I just started hitting 'em. And I started telling them things. Everything that I would ask them they would tell me.

"Q. Okay, what, what—

"A. But, but, but then my little girl cried.

"Q. Who was crying?

"A. I don't know. And that, that's when I guess they showed me, they told me that I had a twin, the voices. And every so often there was no feelings in them. I went to the B Ward because they wanted to send me to the B Ward.

"Q. When?

"A. Weeks ago.

"Q. Who wanted to send you over there?

"A. Joey Lopez.

"Q. Who's Joey Lopez?

"A. A neighbor to Dorothy and they would talk.

"Q. Who would talk?

"A. Dorothy and Joey.

"Q. About what?

"A. But Joey was next door.

"Q. Hmm.

"A. And I couldn't see how that happened. I was beating my baby, my newborn baby.

"Q. Which one—which one were you beating?

"A. I was beating him.

"Q. Which one?

"A. Steven.

"Q. You were beating Steven? With what?

"A. With my hands.

"Q. Your hands?

"A. I was beating him and beating him. He had light bruises. I could see, 'cause when I used to take care of him, they would make me settle for this baby that was asleep, that put me through a lot of trouble, that cried all day, and wouldn't sleep like a newborn baby. But I saw him, he was up at the times that I used to see him, he was up, and I would shake my baby and I would want to play with him but they wouldn't let me.

"Q. Who wouldn't let you?

"A. I don't know.

"Q. So you were beating your baby Steven with your hands?

"A. Yeah.

"Q. Okay. Tell me again why you were hitting him with your hands?

"A. I don't know. I just woke up that morning, this morning like that. And I drank one beer.

"Q. You drank one beer?

"A. And the kids, I wasn't even watching 'em. And they were like somebody was telling 'em, bossing them. They had beer, they had soda, they had everything all over the floor.

"Q. The kids had beer and soda all over the floor?

"A. Yeah. And I was wondering what kids they are?

"Q. What kind of beer did you drink?

"A. Budweiser.

"Q. Was it a tall can or a little can?

"A. Small can. And there was no spray paint about it. There was no sherm, no dust, no nothing about it.

"Q. About how many times did you hit Steven?

"A. A lot of times.

"Q. A lot of times. Just with your hands?

"A. Yeah.

"Q. Was he crying when you were hitting him?

"A. No, he was like, laughing, not laughing but, just like this. And then I holded his mouth and he knew he was dying, and they put my baby through, they would take him away (unintelligible) his mouth I thought—

"Q. What else do you remember doing to Steven?

"A. I kept on hitting him and hitting him. And he was crying like a bird. A month ago back the bird chased me.

"Q. A bird chased you.

"A. (Unintelligible)

"Q. When?

"A. And he wanted to get me. I don't know why.

"Q. When was this?

"A. About a month ago, almost a year and a half to two years. And he chased me and he wanted to get me and I don't know why. The next thing you know, the same way he chased me, but the bird wasn't crying. She just was chasing me and chasing me. And he cried, he cried today when I was beating my son.

"Q. The bird did?

"A. Yeah.

"Q. You put your hand over Steven's mouth?

"A. Yeah.

"Q. To stop him from breathing? And did he stop breathing?

"A. No. He had an older person in him. He had my sister in him.

"Q. He had your sister in him?

"A. Yeah, and my brother. And he had a part of a knife that went through him, they pulled it back out of him and I don't know. And up to this day I'll never say I am who I am.

"Q. Were you trying—what were you trying to do when you were hitting Steven?

"A. Kill that bird out of him.

"Q. Is that what you wanted to do when you were hitting Steven?

"A. Yeah. Because Steven wasn't crying.

"Q. Did you know you were hurting Steven?

"A. I didn't think so, there was nothing to think about hurting him. It was just to kill that bird, to give me my Steven's life. Because when they made me beg for mine, they made me beg who I was. And everybody thought I was crazy. Everybody thought I was, huh, stupid, that drugs did it all to me. Knowing when they made me do all that I guess I lost him when that bird came into him.

"Q. Okay, about how many times did you hit Steven?

"A. A lot of times.

"Q. A lot of times. About how many times did you try to stop him from breathing?

"A. A lot of times.

"Q. Lot of times.

"A. What I don't get. Why did blood out through his mouth?

"Q. Blood came out through his mouth?

"A. Yeah, through his mouth.

"Q. I don't know.

"A. And his nose. He was letting a lot of blood out. I didn't choke him to squeeze the blood out of him. I just squeezed his stomach, his ribs, the inside of him. I didn't kill 'em. I just bruised him a little bit to get it to come out of him. But I didn't kill him to say I'm a murderess and I wanna kill him.

"Q. What hand were you hitting Steven with?

"A. Both of 'em.

"Q. Both of 'em.

"A. The same with my daughter and my son. They threw out blood.

"Q. What did you do to Daniel? Remember what you did to Daniel?

"A. Yeah, the same way. But he was telling me things.

"Q. Does Daniel know how to talk now?

"A. Yeah. He was talking a lot.

"Q. What was he telling you?

"A. He was saying it was Sherrie's fault.

"Q. Who's Sherry?

"A. Sherry Montana.

"Q. What else did Daniel tell you?

"A. He was saying that she wanted to take him to go live with her. And she was taking him away from me. And I fought her before. And a lot of pins on my head, snakes were on my arms. I was burned. A pole inside of me with the bird, you name it. But I told her, kill me before you take my baby and that's what kept on and we fought.

"Q. What did you do to Daniel?

"A. And she turned every friend that I have against me. And everyone else that took me into jail for no reason and everything, she took 'em all away from me.

"Q. What did you do to Daniel, Mary?

"A. I hit him, I kicked him, I hit him, I did everything.

"Q. You hit him, what'd you hit him with?

"A. My hand. And you think my sister Rita would stop me, huh.

"Q. Rita was the one that came home?

"A. She was there. She got near me and walked off.

"Q. When did Rita get there?

"A. She's been there.

"Q. Been there. Okay. What did you do to Crystal, your daughter?

"A. What did I do to her? I hit her. I slapped her, and I socked her in the face.

"Q. Why did you hit her and sock her in the face?

"A. I—just for one day I, I spoke up and I was hearing voices and I said, well, I was arguing with the voices and I said (unintelligible) somebody was talking and saying grownups are kids and I spoke up and I said, yeah, they're kids, and that is all I said and I don't know how, but it happened, (unintelligible)

"Q. About what time did you start hitting your kids?

"A. About twenty minutes before you got there.

"Q. Okay, so you didn't start until a long time after you had gotten up?

"A. Uh-huh. A long time. I played with them. I was having fun with them.

"Q. Did you feed 'em at all today?

"A. No.

"Q. No.

"A. No.

"Q. You haven't—when was the last time you fed your kids?

"A. I, I fed 'em, let me see (unintelligible)

"Q. You don't remember when the last time was that you fed 'em? No? Okay, who was the first person who tried to stop you from hitting your kids?

"A. Nobody was there. It was already done and over with, just after the baby choked on the blood and everything I left him to fall asleep and then they came back. And the birds

came out again, they were crying. My baby was talking, telling me—never had a kid like that. That's why I stopped. (Unintelligible) and Daniel stopped, but Steven, I had to beat him. I never had a kid like that. I never, I never lived a life like that. But to bring me from where I am, I mean, I won't go through it. I'm telling you right now, I'll get out and it'll be worser, because I'm gonna kill the person that brought me to this life. I'm not gonna walk on through it and live on through it. I'm gonna kill the person. I mean kill every bird that's with them and kill the person, and I will not go along with it, I will not. They could try to have me every time and I'll still come out the same, every time. They could bring me one father, one mother, any different father and mother, and it's gonna come back because they tried it before, and tell me how far did they get?

"Q. Okay. What was the reason that you, I know you hit Steven because of the birds and all. Why did you hit Daniel and what were you trying to do to him?

"A. Nothing. Nothing. I don't remember. I'll remember later, but right now I don't remember.

"Q. Well, why did you hit Crystal?

"A. She wanted to tell me something but somebody uh—oh, I was supposed to fight Dorina Ornelas (unintelligible) I made a bet. This bet turned on me and made me go against my daughter instead of Dorina.

"Q. Okay. What were you trying to do to Crystal?

"A. I was hiding her, like a (unintelligible)

"Q. And what were you trying to do? How bad did you want to hurt her? Or did you want to hurt her? How bad did you want to hurt her?

"A. I didn't want to hurt her. I was just so fed up with, you know, how do you say it, her attitude and her (unintelligible) that she had all of them through her. I mean, she wasn't one Dorina by herself, she had a lot through her, you know, and I was fed up with so much of that. And the person that I guess got to me, made me go off on the kids, made (unintelligible) and I won't say that was my (unintelligible) because I (unintelligible)

"Q. I'm gonna step out for a minute. Go ahead and just relax, I'll be back in a second, okay? (Pause) Okay, how do you feel now? You feel okay?

"A. Uh-huh.

"Q. Um, who was the first person that discovered you were beating on your kids? Who walked in and said anything to you? Who was the first adult or anybody?

"A. My sister Marina.

"Q. Marina came in?

"A. Uh-huh.

"Q. What, how did Marina come in, she just walked in the house? And what did she say to you?

"A. Nothing, nobody saw until a few minutes and then they saw.

"Q. What, what did Marina say?

"A. She just looked at the kids and she just started yelling and yelling. She said, 'Look what you've done to the kids.' I said, 'I didn't do nothing to 'em.' (Unintelligible) Garcia went in there and she started to yell at me, 'I ought to beat your fucking head in.' She knew I was right, what I was telling her. She said (unintelligible) that bird was dead, but I choked him. You wouldn't choke your kids. I choked him.

"Q. Okay, and so Marina then, um, did you fight Marina, or did you fight Rosie or anybody else?

"A. I just fought Rosie. Me and Rosie started fighting.

"Q. Okay. Who won the fight?

"A. It was a funny fight.

"Q. What was funny about it?

"A. She was, she was like torturing me to fight. I don't know if she ever wanted to get me before or not, but she was towards me, like to pull my kids in front, like she wanted to make me go that way. It happened, see, because I was hearing a lot of stories, a lot of 'em. And, I just laughed about it and because, huh, I want to stay this way, and I'm going to go out and get my revenge.

"Q. Did Marina or Rosie tell you that they were gonna call the police or call the paramedics?

"A. No. And then she just called them. And Rosie yelled out to my sister to go call them. I don't know. I was hated.

"Q. Okay. When did Alex get there?

"A. Alex got there the same time, Alex got there, he wasn't even with Dorothy when he got there.

"Q. How come they were holding you down? When I got there they were holding you down on the couch. Why were they doing that to you?

"A. How come they were holding me down? Because, 'cause I wouldn't let them get near my baby. I told them to leave him alone, just leave him alone, let that bird go away out of him. I know I killed the bird, 'cause he wouldn't have spit up. He spitted up blood. The baby would have died instantly and he would have fought me, wouldn't fought me that many times. I know, I know when there's a crib death of a baby I know how a baby can die and I know what a baby is, how (unintelligible) and how long it could last. And when it can go through that many bodies like that, it's not of human.

"Q. Is there anything else you want to tell me? Anything else you can think about?

"A. Just asking for voices that I hear (unintelligible)

"Q. How often do you hear these voices?

"A. Every day.

"Q. Every day?

"A. Sometimes I'm like playing with them and talking to them, and be their enemy for about five minutes and then I'm not no more. They can tell me what's gonna happen (unintelligible) I'm gonna walk.

"Q. Have you ever hit your kids before? Hurt 'em bad?

"A. No, I never hit 'em. I don't hit my kids. My mom spanks 'em a lot when they're over there. My mom she spanks 'em and then she started spanking them almost every day.

"Q. Okay. Let me ask you just one more time. Why did you hit your, why did you hit Steven?

"A. Why did I hit him? I don't know. I, I can't tell you how it started.

"Q. Okay, what were you trying to do when you hit Steven?

"A. What was I trying to do? I don't know, I just remembered hearing a bird in him and trying to kill it and then (unintelligible) choked (unintelligible) I don't know how I started hitting him, I don't know why I hit him. I don't know.

"Q. Okay. Why did you hit Daniel?

"A. The same. I don't know.

"Q. What were you trying to do to Daniel?

"A. Nothing. I was feeling sorry for him.

"Q. Why did you hit Crystal?

"A. Why did I hit Crystal? I don't know.

"Q. What were you trying to do with Crystal (unintelligible)?

"A. Nothing. I just asked her for explanations.

"Q. Did you hit them with anything else other than your fist and your hands?

"A. No.

"Q. Did you throw them anywhere?

"A. I threw Crystal. I was throwing her back and forth like that, that's all.

"Q. How were you holding on to her?

"A. By her hair.

"Q. By her hair?

"A. Uh-huh.

"Q. Is there anything else you wanna tell me?

"A. No.

"Q. Okay, from here we're gonna go to county jail and um, you'll be booked into county jail and you'll stay there while we have to complete our investigation. Okay? They'll set a bail for you, maybe, I don't know. Um, you'll probably go to court sometime next week.

"A. All right."