Filed 11/23/16

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BRETT HAVEN THIEL,<br><br>    Defendant and Appellant. | D069111<br><br><br>(Super. Ct. No. SCE350545) |


APPEAL from a judgment of the Superior Court of San Diego County, Evan P. Kirvin, Judge.  Affirmed.


Kevin Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Brett Haven Thiel of elder abuse with force likely to cause great bodily harm or death (Pen. Code,[1] § 368, subd. (b)(1); count 1); elder abuse (§ 368, subd. (c); count 2); witness intimidation (§ 136.1, subd. (b)(1); count 3); and resisting an officer (§ 69; count 4). The jury also found true the allegation that defendant, in the commission of count 1, did personally inflict great bodily injury on a person 70 years of age or older (§ 12022.7, subd. (c)). The court sentenced defendant to three years' probation, which included one year in a residential mental health facility.

On appeal, defendant contends the court improperly instructed the jury concerning the extent to which it could consider evidence of mental incapacity in determining whether he harbored the requisite criminal intent to be convicted of elder abuse in counts 1 and 2. Defendant further contends defense counsel was ineffective by not requesting an instruction that defendant's alleged mental incapacity could negate the requisite intent he contends was required to support such convictions. Affirmed.

FACTUAL BACKGROUND

Joan Thiel (Joan) testified she and her sister, Joyce Boutte (Joyce), were watching television together at Joyce's house in the early evening of May 8, 2015. Joan, then aged 79, is defendant's mother and Joyce, then aged 91, is defendant's aunt. About 7:00 or 8:00 p.m., the two women heard a "loud banging" on the front door, which Joan testified was "unusual" at Joyce's house. When Joan asked "who was there," she received no

---

[1]     All further statutory references are to the Penal Code.

response.  However, she saw defendant's car through the window.  They had not expected to see defendant that day.

Joan testified her son suffers from mental illness.  After the front door was opened, Joan immediately could tell defendant was "very manic" and "very angry" as he "barged" through the door.  After he came inside, defendant walked over to a boyhood picture of Joan's father (defendant's grandfather) hanging on the wall.  Although defendant in the past had "reacted" to this picture, according to Joan that reaction had not been "drastic." However, on this occasion defendant took the picture off the wall and came toward the two women, who were both sitting in chairs.  Defendant threw the picture on the floor and stomped on it, breaking the picture.  Defendant's behavior surprised Joan.

Joan testified defendant next went to Joyce, forcefully grabbed her by both wrists and "pulled her from the chair, just slid her down, and she started screaming [and] getting upset."  When Joan tried about three times to help her sister, each time defendant grabbed Joan from the back of her shoulders, "drag[ged]" her back to the chair and "thr[e]w" her in the chair.  Joan further testified that defendant also put Joyce back in Joyce's chair about the same number of times when Joyce tried to help her; that when doing so, defendant "kind of fold[ed Joyce] up"; that he was a "little rough" and "forceful" with Joyce when putting her back in the chair; and that he kept going back and forth, forcing the women back in their chairs so they were unable to call police.  During the incident, Joan pleaded with defendant to stop, as did Joyce, who Joan described as "hysterical."

3

Joan testified she located the phone and called 911. Defendant in response grabbed the phone out of her hand and exclaimed he was leaving. As he walked out the front door, police arrived.

Joyce also testified at trial. When defendant came inside her house, he immediately went over to the picture of her father's brother (i.e., Joyce's uncle). Joyce was "shocked" at defendant's behavior, as he was "[j]ust ranting." According to Joyce, after defendant finished "tossing [them] around," he said in reference to the picture, " 'Now you know . . . that he [i.e., Joyce's uncle/defendant's grandfather] raped my mother, don't you?' "

Joyce testified that in one instance when defendant pushed her, she fell on one knee to the floor. As defendant pulled her up off the floor, he broke her wrist and "tore the skin on [her] arms," which caused scarring. Joyce also sustained an injury to her knee.

According to Joyce, as each sister tried to help the other defendant would push them back into their chairs. Joyce estimated this occurred about six times. As this was occurring, both women were "yelling" for "help." At some point, Joan grabbed the telephone to call the police. Joyce heard defendant say in response, " 'Don't you dare call the police,' " and then saw him quickly grab the phone from Joan. As defendant left, he threw the telephone into the back of Joan's car.

La Mesa Police Officer Colin Atwood testified he responded to the 911 call at Joyce's house. Because dispatch heard screaming and yelling before the phone line went

4

dead, police initially thought it was a domestic violence incident. As such, Officer Atwood parked a short distance from Joyce's house and then stood on the sidewalk outside Joyce's house as he waited for backup. As he waited, Officer Atwood saw a man later identified as defendant exit the house and walk quickly toward the street.

On contact, defendant sat on the curb at the request of Officer Atwood. A few seconds later, as Officer Atwood attempted to ascertain what was happening, defendant "just suddenly stood up." Although defendant followed Officer Atwood's direction to sit back down, Officer Atwood testified that about 10 or 15 seconds later, defendant again stood up but this time walked away from the officer.

Because Officer Atwood was still waiting for backup and because he had been unable to determine what was happening inside the house, Officer Atwood grabbed defendant's arm and told defendant he was detained. Defendant in response "spun around" and "began violently pulling his hands" away, trying to break Officer Atwood's grip in an effort to free himself. Officer Atwood estimated this went on for about 30 seconds. During this time period, Officer Atwood repeatedly told defendant to " '[s]top resisting' " and to "[p]ut [his] hands behind [his] back."

Finally, defendant broke free and ran into the street. When Officer Atwood caught up with defendant, he again grabbed defendant and this time told defendant he was "under arrest." Once again, defendant struggled with Officer Atwood in an effort to break away. Officer Atwood estimated this struggle in the street went on for about 30 more seconds.

5

During the struggle, defendant freed himself and ran about 30 or 40 yards down a side street, around a parked car, and then headed back in the direction of Joyce's house with Officer Atwood in pursuit. Once back inside, defendant sat in a chair and "put his hand down behind the chair where [the officer] could not see [it]." Concerned, Officer Atwood testified he "dove" straight at defendant and "pin[ned] him up against the wall." Officer Atwood saw defendant had nothing in the hand defendant had been hiding. Backup arrived, and the officers eventually subdued defendant and arrested him.

## DISCUSSION

A. *Additional Background*

As relevant to counts 1 and 2, the trial court instructed the jury with modified CALCRIM No. 252 in part as follows:

"The crimes and allegations charged require proof of the union, or joint operation, of act and wrongful intent.

"The following crimes and allegation[s] require general criminal intent: Abuse of Elder Likely to Produce Great Bodily Harm or Death, as charged in Count 1; Personal Infliction of Great Bodily Injury as alleged in Count 1; and Abuse of Elder as charged in Count 2. For you to find a person guilty of these crimes or to find the allegation true, that person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act; however, it is not required that he or she intend to break the law. The act required is explained in the instruction for that crime or allegation."

6

The court also instructed the jury as follows with modified CALCRIM No. 830, elder abuse likely to produce great bodily harm or death:

"The defendant is charged in Count One with elder abuse likely to produce great bodily harm or death in violation of Penal Code section 368(b)(1). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant willfully inflicted unjustifiable physical pain or mental suffering on JOYCE BOUTTE; [¶] 2. The defendant inflicted suffering on JOYCE BOUTTE under circumstances or conditions likely to produce great bodily harm or death; [¶] 3. JOYCE BOUTTE is an elder; [¶] AND [¶] 4. When the defendant acted, he knew or reasonably should have known that JOYCE BOUTTE was an elder.

"Someone commits an act *willfully* when he or she does it willingly or on purpose. [¶] *Great bodily injury* means significant or substantial physical injury.  It is an injury that is greater than minor or moderate harm. [¶] An *elder* is someone who is at least 65 years old. [¶] *Unjustifiable* physical pain or mental suffering is pain or suffering that is not reasonably necessary or is excessive under the circumstances. [¶] An elder does not need to actually suffer great bodily harm.  But if an elder does suffer great bodily harm, you may consider that fact, along with all the other evidence, in deciding whether the defendant committed the offense."

As further relevant to this analysis, the court also gave the jury modified CALCRIM No. 831, elder abuse absent conditions likely to produce great bodily harm or death:

7

"The defendant is charged in Count 2 with Elder Abuse in violation of Penal Code section 368(c). Elder Abuse in violation of Penal Code section 368(c) is also a lesser included offense to the greater crime of Elder Abuse Likely to Produce Great Bodily Harm or Death in violation of Penal Code section 368(b)(1), as charged in Count 1.

"To prove that the defendant is guilty of this crime, the People must prove that: 1. The defendant willfully inflicted unjustifiable physical pain or mental suffering on JOAN THIEL; [¶] 2. JOAN THIEL is an elder; [¶] AND [¶] 3. When the defendant acted, he knew or reasonably should have known that JOAN THIEL was an elder.

"Someone commits an act *willfully* when he or she does it willingly or on purpose. [¶] An *elder* is someone who is at least 65 years old. [¶] *Unjustifiable* physical pain or mental suffering is pain or suffering that is not reasonably necessary or is excessive under the circumstances."

Finally, the court gave the jury modified CALCRIM No. 3428, which provides in part:

"You have heard evidence that the defendant may have suffered from a mental disease, defect, or disorder. You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted with the intent or mental state required for that crime.

"The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, specifically: knowledge that JOYCE BOUTTE was an elder. If the People have not met this burden, you must find

8

the defendant not guilty of elder abuse likely to produce great bodily harm or death, as charged in Count 1."[2]

B. *Guiding Principles*

"The law imposes on a trial court the sua sponte duty to properly instruct the jury on the relevant law and, as such, requires the giving of a correct instruction regarding the intent necessary to commit the offense and the union between that intent and the defendant's act or conduct." (*People v. Alvarado* (2005) 125 Cal.App.4th 1179, 1185 (*Alvarado*).) We review de novo a trial court's instruction on intent and/or mental state. (*People v. Alvarez* (1996) 14 Cal.4th 155, 219–220.)

" 'Specific and general intent have been notoriously difficult terms to define and apply . . . .' (*People v. Hood* (1969) 1 Cal.3d 444, 456 [(*Hood*)].) However, some principles are settled: 'When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent.' (*Id.* at pp. 456–457.)" (*Alvarado*, *supra*, 125 Cal.App.4th at p. 1186.) "General criminal intent thus requires no further mental state beyond willing commission of the act proscribed by law." (*People v. Sargent* (1999) 19 Cal.4th 1206, 1214-1215 (*Sargent*).)

---

2    The record shows the court repeated CALCRIM No. 3428 without the "great bodily harm or death" language when instructing the jury on count 2, involving Joan.

9

"In other words, if the end in view is simply a proscribed act, the intent required is only a general one because no further acts or future consequences are envisioned from the illegal act. [Citations.] Conversely, when the end in view looks to a further consequence of the act, the intent is specific. [Citations.] Specific intent crimes typically contain such phrases as ' "with the intent to" ' achieve or ' "for the purpose of" ' achieving some additional result. (*People v. Atkins* (2001) 25 Cal.4th 76, 86 (*Atkins*).)" (*Alvarado*, *supra*, 125 Cal.App.4th at p. 1186.)

"[T]he distinction between general intent and specific intent crimes is at bottom founded upon a policy decision regarding the availability of certain defenses." (*People v. Gutierrez* (1986) 180 Cal.App.3d 1076, 1081 (*Gutierrez*).) As a defense, "[m]ental illness poses a policy dilemma similar in many respects to that of [the defense of] voluntary intoxication. (See *People v. Wells* (1949) 33 Cal.2d 330, 357.) A defendant who pleads and proves insanity is totally absolved of criminal responsibility although subject to civil confinement. If the defendant chooses not to enter an insanity plea, or if the evidence is not sufficient to establish insanity, then sympathy toward the mentally ill defendant must be balanced against the considerations that such a person, being either legally sane or having voluntarily relinquished an insanity defense, may not be entirely blameless and may present a continuing public danger. *Accordingly, the rule has developed that evidence of mental illness may be offered to show the absence of specific intent but not to prove the absence of general intent.* (*People v. Drew* (1978) 22 Cal.3d 333, 344; *People v. Gauze* (1975) 15 Cal.3d 709, 719; *People v. Noah* (1971) 5 Cal.3d

10

469, 477–478 [other citations omitted].)" (*Gutierrez*, at p. 1082, italics added; see § 28, subd. (a) [providing in part that "[e]vidence of mental disease, mental defect, or mental disorder is admissible *solely* on the issue of whether or not the accused actually formed a required *specific intent*, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged" (italics added)].)

Although defendant recognizes that the offense of elder abuse under section 368 is typically classified as a general intent crime, he nonetheless contends the court erred when it failed to include in CALCRIM No. 3428 an instruction that his alleged mental incapacity could negate the element of "willfulness" or the term "willfully," as used in subdivisions (b)(1) and (c) of section 368.

According to defendant, willfulness or the term "willfully" imposed a knowledge requirement, such that these subdivisions should be read to provide that, when a defendant willfully inflicts "unjustifiable physical pain or mental suffering," the defendant did so "for the purpose of bringing about . . . such a result," or words to that effect. (Italics omitted.) Defendant thus contends proof of specific intent was required for conviction in counts 1 and 2, which intent, in turn, could be negated by mental incapacity. (See *Gutierrez*, *supra*, 180 Cal.App.3d at p. 1082; see also § 28, subd. (a).)

To resolve this issue, we turn to the language of the statute. (See *People v. Hering* (1999) 20 Cal.4th 440, 445 [noting whether an offense requires proof of general or specific criminal intent "begin[s] with an examination of the statutory language describing the proscribed conduct, including any express or implied reference to a mental

11

state"].) In interpreting a statute, " 'our fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose.' [Citation.] 'We begin with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context, because the language employed in the Legislature's enactment generally is the most reliable indicator of legislative intent.' [Citations.] The plain meaning controls if there is no ambiguity in the statutory language." (*People v. Cornett* (2012) 53 Cal.4th 1261, 1265 (*Cornett*).)

C. *Section 368 and the Requisite Criminal Intent*

At the time defendant committed the offense in 2015, former section 368[3] provided in relevant part:

"(a) The Legislature finds and declares that crimes against elders and dependent adults are deserving of special consideration and protection, not unlike the special protections provided for minor children, because elders and dependent adults may be . . . less able to protect themselves, to understand or report criminal conduct, or to testify in court proceedings on their own behalf.

"(b)(1) Any person who knows or reasonably should know that a person is an elder or dependent adult and who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any elder or dependent adult to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the

---

3    Section 368 was amended without substantive change effective January 1, 2016 to include subdivision (l), giving a court the discretion to issue an order restraining a defendant convicted under certain subdivisions of the statute for up to 10 years. (Stats. 2015, ch. 279 (S.B.352), § 2 eff. Jan 1, 2016.)

12

care or custody of any elder or dependent adult, willfully causes or permits the person or health of the elder or dependent adult to be injured, or willfully causes or permits the elder or dependent adult to be placed in a situation in which his or her position or health is endangered, is punishable by imprisonment in a county jail not exceeding one year, or by a fine not to exceed six thousand dollars ($6,000), or by both that fine and imprisonment, or by imprisonment in the state prison for two, three, or four years.

"(2) If in the commission of an offense described in paragraph (1), the victim suffers great bodily injury, as defined in Section 12022.7, the defendant shall receive an additional term in the state prison as follows: [¶] . . . [¶] (B) Five years if the victim is 70 years of age or older. [¶] . . . [¶]

"(c) Any person who knows or reasonably should know that a person is an elder or dependent adult and who, under circumstances or conditions other than those likely to produce great bodily harm or death, willfully causes or permits any elder or dependent adult to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any elder or dependent adult, willfully causes or permits the person or health of the elder or dependent adult to be injured or willfully causes or permits the elder or dependent adult to be placed in a situation in which his or her person or health may be endangered, is guilty of a misdemeanor.  A second or subsequent violation of this subdivision is punishable by a fine not to exceed two thousand dollars ($2,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment."

Our high court's decision in *Sargent* provides guidance on the instant issue. There, the court interpreted former section 273a, a child endangerment statute, in analyzing the mens rea requirement for a conviction of felony child abuse "based on direct infliction of unjustifiable pain and mental suffering." (*Sargent*, *supra*, 19 Cal.4th at p. 1209.) Significant to the instant case, in interpreting former section 273a the court relied in part on former section 368, noting that the two statutes were "virtually identical" (*Sargent*, at p. 1216), that "[s]ection 368 was patterned on . . . section 273a" (*ibid.*, fn. 6) and that "[c]ases interpreting one section [were] therefore appropriately used to interpret the other" (*ibid.*).

Like section 368 at issue in the instant case, the *Sargent* court noted former section 273a, subdivision (a)(1) proscribed "essentially four branches of conduct. At the time of defendant's crimes, and in substantively identical form currently, it provided: 'Any person who, under circumstances or conditions likely to produce great bodily harm or death, [1] willfully causes or permits any child to suffer, or [2] inflicts thereon unjustifiable physical pain or mental suffering, or [3] having the care or custody of any child, willfully causes or permits the person or health of such child to be injured, or [4] willfully causes or permits such child to be placed in such situation that its person or health is endangered, is punishable by imprisonment in the county jail not exceeding one year, or in the state prison for 2, 4, or 6 years.' " (*Sargent*, *supra*, 19 Cal.4th at p. 1215.)

The *Sargent* court observed that "violation of section 273a(1) [now subdivision (a)(1)] 'can occur in a wide variety of situations: the definition broadly includes both

active and passive conduct, i.e., child abuse by direct assault and child endangering by extreme neglect' "; and that " '[t]wo threshold considerations . . . govern all types of conduct prohibited by this law: first, the conduct must be willful; second, it must be committed "under circumstances or conditions likely to produce great bodily harm or death." [Citation.] Absent either of these elements, there can be no violation of the statute.' " (*Sargent*, *supra*, 19 Cal.4th at pp. 1215-1216.)

In analyzing "branch" No. 2, which the *Sargent* court noted was the only conduct at issue before it, the court concluded "[t]he language 'inflicts [on a child] unjustifiable physical pain or mental suffering' " was "most readily interpreted as requiring *general criminal intent*. That is, the statute describes 'a particular act, without reference to intent to do a further act or achieve a future consequence.' (*People v. Hood*, *supra*, 1 Cal.3d at pp. 456-457.)" (*Sargent*, *supra*, 19 Cal.4th at p. 1219.) As such, the court concluded that criminal negligence was not an element of the offense and that a defendant instead "must have a mens rea of general criminal intent to commit the proscribed act." (*Id.* at p. 1224.)

In response to the defendant's contention that proof of criminal negligence was required to establish the element of " 'under circumstances or conditions likely to produce great bodily harm or death,' " the *Sargent* court found "no basis for concluding that the appropriate mens rea for direct infliction of unjustifiable physical pain or mental suffering is contained" in the conditions or circumstances element of the offense. (*Sargent*, *supra*, 19 Cal.4th at p. 1221.) The *Sargent* court noted that section 273a did not, for example, "provide that a defendant must 'know or reasonably should know that

15

his or her actions occur under circumstances or conditions likely to produce great bodily harm or death.' Rather, the statute proscribes the infliction of unjustifiable physical pain or mental suffering on a child. Whether that infliction is 'under circumstances or conditions likely to produce great bodily harm or death' is a question for the trier of fact. . . .

"In this manner, section 273a(1) is similar to that portion of section 245, subdivision (a)(1), which proscribes 'assault . . . by any means of force likely to produce great bodily injury.' Numerous cases have held that whether the force used by the defendant was likely to produce great bodily injury is a question for the trier of fact to decide. [Citations.] Moreover, similar language in other penal statutes has not precluded them from being interpreted as general criminal intent statutes. (See *People v. Carter* (1998) 60 Cal.App.4th 752, 755-756 [Section 12022.7, subdivision (d), which provides, 'Any person who personally inflicts great bodily injury under circumstances involving domestic violence in the commission or attempted commission of a felony,' is a general intent statute.]; *People v. Gonzales* (1994) 29 Cal.App.4th 1684, 1691, 1695, 1698, called into doubt on other grounds in *People v. Reed* (1996) 13 Cal.4th 217, 229 [Section 1192.7, subdivision (c)(8), which deems 'serious' 'any other felony in which the defendant personally inflicts great bodily injury on any person, other than an accomplice,' is a general intent statute.].)" (*Sargent*, *supra*, 19 Cal.4th at pp. 1221-1222.)

16

D. *Analysis*

Here, applying the principles articulated in *Sargent*, which interpreted the exact language—albeit in a related statute—at issue in the instant case, we conclude that when the conduct proscribed involves the direct infliction of unjustifiable physical pain or mental suffering on an elder or dependent adult (i.e., branch No. 2), as set forth in subdivisions (b)(1) and (c) of former section 368, a defendant must have a mens rea of general criminal intent because branch No. 2 describes " 'a particular act, without reference to intent to do a further act or achieve a future consequence.' " (See *Sargent*, *supra*, 19 Cal.4th at p. 1219, quoting *Hood*, *supra*, 1 Cal.3d at pp. 456-457.)

Further, like our high court in *Sargent*, we do not interpret the language "under circumstances or conditions likely to produce great bodily harm or death" in subdivisions (b)(1) and (c) of former section 368 to require any additional proof of intent, nor does defendant argue as such. Rather, following *Sargent*, we conclude this language merely "states the context in which the subdivision applies" (see *Sargent*, *supra*, 19 Cal.4th at p. 1223) and is a question of fact for the jury (see *id.* at pp. 1221-1222).

Defendant attempts to distinguish *Sargent* by arguing our high court in that case did not address the "mental elements of knowledge or willfulness" and, thus, "expressed no view on whether the mental incapacity defense might apply." However, this argument misses the point; while it is true the defense of mental incapacity was not at issue in *Sargent*, what *was* at issue was the mens rea required to prove branch No. 2—the same proscribed conduct at issue in our case involving elder, as opposed to child, abuse.

17

Interpreting the *identical* language at issue in our case, as noted, the *Sargent* court found that only general criminal intent was required to prove this offense.

Moreover, we reject defendant's contention that the "willfulness requirement"[4] in branch No. 2 allegedly included an element of knowledge to bring about the direct infliction of pain or mental suffering, requiring proof of specific intent. For one thing, the wording in both subdivisions shows when the Legislature wanted to include such an element, it recognized how to do so, inasmuch as both subdivisions (b)(1) and (c) of former section 368 require that a defendant "*knows or reasonably should know* that a person is an elder or dependent adult." (Italics added.)

For another thing, several courts—including this court—have recognized that a statute proscribing willful behavior is a general intent offense unless other language, which we already have noted is absent in former section 368, requires a specific intent. For example, this court in *Alvarado* analyzed whether the crime of animal cruelty, as defined in former section 597, subdivision (a),[5] required proof of general or specific intent.

_____

4      We say "willfulness requirement" because under branch No. 2, in contrast to branch Nos. 1, 3 and 4, the Legislature omitted the word "willfully" from subdivisions (b)(1) and (c) of former section 368: "[1] *willfully* causes or permits any elder . . . to suffer, or [2] inflicts thereon unjustifiable physical pain or mental suffering, or [3] having the care or custody of any elder . . . , *willfully* causes or permits the person or health of the elder . . . to be injured or [4] *willfully* causes or permits the elder . . . to be placed in a situation in which his or her position or health may be endangered." (Italics added.)

5      Subdivision (a) of former section 597 provided in part: "[E]very person who *maliciously and intentionally* maims, mutilates, tortures, or wounds a living animal, or *maliciously and intentionally* kills an animal, is guilty of an offense punishable by

18

In concluding section 597, subdivision (a) only required proof of a general criminal content, this court in *Alvarado* noted that the statute did not require an offender to "have an intent to do some further act or achieve some further consequence other than the proscribed acts" (*Alvarado*, *supra*, 125 Cal.App.4th at p. 1186); that the statute did not contain phrases such as " 'with the intent to' or 'for the purpose of' that would be used in a specific intent crime" (*id.* at pp. 1186-1187); and that, "[i]f the Legislature intended section 597, subdivision (a) to describe a specific intent crime, it would have used language describing an act and an additional purpose for which the act was done.  For instance, the statute could have read, 'Every person who maliciously and intentionally strikes a living animal, with the intent to maim, mutilate, etc.'  Or the statute could have read, 'Every person who maliciously and intentionally maims, mutilates, tortures or wounds a living animal, for the purpose of inflicting pain and suffering . . . .'  Drafted in either manner, the statute would have described a specific intent crime.

"Nor does the combination of the words 'maliciously and intentionally' turn section 597, subdivision (a) into a specific intent statute.  *Atkins*, *supra*, 25 Cal.4th 76, is instructive.

"In *Atkins,* the California Supreme Court was presented with the issue of whether the crime of arson was a general or specific intent crime.  The statute at issue there,

---

imprisonment in the state prison, or by a fine of not more than twenty thousand dollars ($20,000), or by both the fine and imprisonment, or, alternatively, by imprisonment in a county jail for not more than one year, or by a fine of not more than twenty thousand dollars ($20,000), or by both the fine and imprisonment."  (Italics added.)

19

section 451, provides that: 'A person is guilty of arson when he or she *willfully and maliciously* sets fire to or burns or causes to be burned or who aids, counsels, or procures the burning of, any structure, forest land, or property.' (Italics added.) In concluding that section 451 was a general intent statute, the high court rejected the idea that the term 'willfully and maliciously' was used to describe a specific intent crime: ' "[T]he terms 'willful' or 'willfully,' when applied in a penal statute, require only that the illegal act or omission occur 'intentionally,' without regard to motive or ignorance of the act's prohibited character." [Citation.] "Willfully implies no evil intent; ' "it implies that the person knows what he is doing, intends to do what he is doing and is a free agent." [Citation.]' " [Citations.] The use of the word "willfully" in a penal statute usually defines a general criminal intent, absent other statutory language that requires "an intent to do a further act or achieve a future consequence." [Citations.]' (*Atkins*, *supra*, 25 Cal.4th at p. 85.)" (*Alvarado*, *supra*, 125 Cal.App.4th p. 1187.)

In light of these authorities, we conclude that the "willfulness requirement" in branch No. 2 implies simply a purpose or willingness to commit the act; and that the mens rea required to convict under branch No. 2, as set forth in subdivisions (b)(1) and (c) of former section 368, is the intent to perform the underlying act causing an elder or dependent adult to suffer pain or mental suffering. We thus decline defendant's invitation to read words into the statute that do not exist, including that a defendant acted "with the intent to" inflict, or "for the purpose of" inflicting, physical pain or mental suffering on an elder or dependent adult.

20

Furthermore, our conclusion that branch No. 2 requires only proof of a general criminal intent finds further support in the public policy underlying section 368. Indeed, in enacting section 368 our Legislature determined "that crimes against elders and dependent adults are deserving of special consideration and protection, not unlike the special protections provided for minor children." (§ 368, subd. (a).) Requiring proof of a specific intent to inflict willfully "unjustifiable physical pain or mental suffering" (§ 368, subds. (b)(1) & (c)), which in turn would make available various defenses to negate that intent, including, for example, mental incompetence, would potentially undermine the important public policy of protecting an elder or dependent adult as expressed by our Legislature. (See *Gutierrez*, *supra*, 180 Cal.App.3d at p. 1081 [noting the "distinction between general intent and specific intent crimes is at bottom founded upon a policy decision regarding the availability of certain defenses"].)

In sum, we conclude the court properly instructed the jury that defendant's alleged mental incompetence could only be considered in connection with the issue of whether defendant "knew" or "reasonably should have known" that Joan and Joyce were "elders" under the law. (See § 368, subd. (g) [noting an " 'elder' means any person who is 65 years of age or older"].) We further conclude the court properly determined defendant was not entitled to an instruction that allowed the jury to consider his alleged mental incompetence when determining whether he willfully inflicted "unjustifiable physical pain or mental suffering" on Joyce, under subdivision (b)(1) of section 368, or on Joan, under subdivision (c) of this statute, because these crimes only require proof of general

criminal intent.  (See *Gutierrez*, *supra*, 180 Cal.App.3d at p. 1082; see also § 28, subd. (a).)

Finally, we note defendant's mental competence, or lack thereof, was considered by the court when it sentenced him to three years' probation, including one year in a residential mental health facility.  Before doing so, the court noted defendant was "presumptively ineligible" for probation, as did the probation report when it "suggested" a prison term of seven years—based on the low term of two years (see § 368, subd. (b)(1)) and the mandatory term of five years (*id.*, subd. (b)(2)(B); § 12922,7, subd. (c))—but ultimately recommended probation as well given the "unusual circumstances" presented.  Thus, far from being a nonissue in this case, the court did in fact consider the alleged mental incompetence of defendant at his sentencing.

Turning to the merits, we conclude there is substantial evidence in the record from which the jury could find defendant knew, or should have known, that Joyce and Joan were each an "elder" as defined under the law, inasmuch as Joyce was his aunt and Joan his mother.  Moreover, the record shows Joyce was 91 years old, or almost 25 years older than the definition of "elder" set forth in the statute (see § 368, subd. (g)), and Joan was 79 years old, or about 14 years older than the statutory definition (*ibid*.), at the time of the incident.[6]  (See *People v. McCurdy* (2014) 59 Cal.4th 1063, 1104 (*McCurdy*) [noting that

_____

6    We mean no disrespect in pointing out the ages of the victims, as age is an element of the offense.  In any event, the record shows before she was injured, Joyce's "regular routine" included playing golf, which she had been doing since 1962; walking Lake Murray at 5:00 a.m. in the morning with other "ladies"; and, *after* walking at Lake Murray, exercising "for about an hour" at a local gym.

22

when considering a claim challenging the sufficiency of the evidence in a criminal case, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt" ' "].)

We also conclude there is substantial evidence in the record to support the finding on count 1 that defendant willfully inflicted "unjustifiable physical pain" on Joyce under "circumstances or conditions likely to produce great bodily harm or death." As summarized *ante*, the record contains evidence that defendant "forcefully" picked up Joyce up from the floor, after she had fallen to one knee while attempting to help her sister; that when defendant forcibly grabbed Joyce, he broke her wrist and "tore the skin on [her] arms," causing her substantial physical injury that required extensive medical treatment; and that defendant intentionally pushed Joyce back into her chair about six times, after Joyce attempted to help Joan, which caused Joyce to fall. (See *McCurdy*, *supra*, 59 Cal.4th at p. 1104.)

Moreover, the evidence in the record also supports the finding defendant willfully inflicted unjustifiable "mental suffering" on Joyce under circumstances likely to produce great bodily harm. Indeed, while inside the house, defendant took a boyhood picture of his grandfather (i.e., Joan's father and *Joyce's* uncle) off Joyce's wall. Defendant next walked over to where the two women sat, slammed the picture to the ground and then stomped on it, proclaiming his grandfather allegedly had "raped" Joan.

23

Moreover, the record shows that throughout the incident, Joyce was yelling for help and was described by Joan as "hysterical"; that defendant had unexpectedly shown up at, and "barged" inside, Joyce's home while she and her sister were watching television; and that, throughout the ordeal, he refused to allow the women to call police despite their repeated pleas for help.

Thus, there is substantial evidence in the record to support the finding in count 1 defendant willfully inflicted "unjustifiable physical pain" *and* "mental suffering" on Joyce under circumstances likely to produce great bodily injury. (See § 368, subd. (b)(1); see also *McCurdy*, *supra*, 59 Cal.4th at p. 1104.)

We conclude this same evidence also supports the jury's finding on count 2 with respect to Joan, as the record shows that defendant repeatedly grabbed Joan from the back of the shoulders, "dragged" her back to the chair and then "threw" her in the chair, after she attempted on at least three occasions to aid her sister; that he stomped and broke the boyhood picture of *Joan's* father in front of Joan; and that, in doing so, he declared that Joan's father allegedly had raped Joan (an accusation she denied). Such evidence, which we deem substantial (see *McCurdy*, *supra*, 59 Cal.4th at p. 1104), supports the finding defendant inflicted "unjustifiable physical pain or mental suffering" on Joan under circumstances *not* likely to cause "great bodily harm or death." (§ 368, subd. (c).)

DISPOSITION[7]

The judgment of conviction is affirmed.

BENKE, Acting P. J.

WE CONCUR:

HUFFMAN, J.

NARES, J.

---

[7] Defendant's additional argument that he allegedly received ineffective assistance of counsel is moot in light of our disposition in this case.